**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LISA FORSEE *et al.*, *on behalf of themselves and all* : 
*others similarly situated*, :
:
                                 Plaintiffs, :
        -against- :         No. 19 Civ. 4406 (ER)
:
METROPOLITAN TRANSPORTATION :
AUTHORITY *et al.*, :
:
                           Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CITY OF NEW YORK'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
Emily Burgess
Special Assistant Corporation Counsel
Martin Bowe
Senior Counsel
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007
(212) 356-1651
eburgess@law.nyc.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 2

LEGAL STANDARDS ........................................................................................................... 6

      I.     DISMISSAL PURSUANT TO RULE 12(B)(1) ........................................ 6

      II.    DISMISSAL PURSUANT TO RULE 12(B)(6) ........................................ 7

ARGUMENT .......................................................................................................................... 8

      I.     THIS COURT LACKS SUBJECT MATTER JURISDICTION .............. 8

           A.   Plaintiffs Fail to Show Causation ........................................................ 8

           B.   Plaintiffs Fail to Show Redressability ............................................... 16

      II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ADA OR REHABILITATION ACT .................................................................... 18

      III.   THIS COURT SHOULD DISMISS PLAINTIFFS' NYCHRL CLAIMS OR, IN THE ALTERNATIVE, DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION ................................................................................ 22

CONCLUSION ...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander v. Choate*, 469 U.S. 287 (1985) .......................................................................... 20

*Amnesty Int'l United States v. Clapper*, 638 F.3d 118 (2d Cir. 2011) ........................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 7, 8

*Atuahene v. City of Hartford*, 10 F. App'x 33 (2d Cir. 2001) ................................................... 7, 9

*Baez v. N.Y.C. Dep't of Transp.,* No. 14 Civ. 2520 (LGS), 2015 U.S. Dist. LEXIS 77711 (S.D.N.Y. June 15, 2015).......................................................................................................... 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) ......................................................................... 7

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................ 9

*Bernstein v. City of New York*, 621 F. App'x 56 (2d Cir. 2015)................................................... 20

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).. 23

*Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 79 N.E.2d at 477 (N.Y. 2017)................................... 2

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016) ............................................................... 8

*Citizens for Responsibility & Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017). 18

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................ 8, 18

*Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41 (2d Cir. 2018)........................................... 7

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411 (2d Cir. 2015)................. 6, 14

*D'Avila v. City of New York*, 613 N.Y.S.2d 435 (App. Div. 2d Dep't 1994).............................. 14

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178 (2d Cir. 2015)............ 18

*Dhinsa v. Krueger*, 917 F.3d 70 (2d Cir. 2019) ............................................................. 6, 8, 9, 16

*Drimal v. Tai*, 786 F.3d 219 (2d Cir. 2015)................................................................................... 7

*Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847 (2d Cir. 1961)................................................... 7

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)................................................................... 6

*Genco v City of New York*, 621 N.Y.S.2d 627 (App. Div. 2d Dep't 1995) ................................. 14

*Gleason v. Scoppetta*, 566 F. App'x 65 (2d Cir. 2014) ................................................................. 8

*Greene v. St. Barnabas Hosp.*, 727 F. App'x 21 (2d Cir. 2018)................................................... 7

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ........................................................... 20

*Indem. Ins. Co. of N. Am. v. Expeditors Int'l of Wash.*, No. 17 Civ. 2575 (JPO), 2019 U.S. Dist. LEXIS 26965 (S.D.N.Y. Feb. 19, 2019)......................................................................................... 2

*Klaper v. Cypress Hills Cemetery*, 593 F. App'x 89 (2d Cir. 2015) ............................................ 23

*Kreisler v. Second Ave. Diner Corp.*, No. 10 Civ. 7592 (RJS), 2012 U.S. Dist. LEXIS 129298 (S.D.N.Y. Sep. 10, 2012) .......................................................................................................... 23

*Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405 (S.D.N.Y. 2018) ......................... 24

*LeBlanc v. UPS*, No. 11 Civ. 6983 (KPF), 2014 U.S. Dist. LEXIS 50760 (S.D.N.Y. Apr. 11, 2014) ............................................................................................................................................ 23

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ............................................................. 14

*Lincoln CERCPAC v. Health & Hosps. Corp.*, 147 F.3d 165 (2d Cir. 1998) ............................. 19

*Linda R. S. v. Richard D.*, 410 U.S. 614 (1973) ......................................................................... 16

*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009) ........................................... 22

*Lovell v. Consol. Edison Co. of N.Y.*, 758 F. App'x 222 (2d Cir. 2019) ..................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 14, 16

*Lyons v. Legal Aid Soc'y*, 68 F.3d 1512 (2d Cir. 1995) ......................................................... 18, 19

*McElwee v. Cty. of Orange*, 700 F.3d 635 (2d Cir. 2012) ..................................................... 18, 22

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013) ...................... 22

*Nat'l Council of La Raza v. Mukasey*, 283 F. App'x 848 (2d Cir. 2008) ...................................... 9

*Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221 (S.D.N.Y. 1999) ................................................... 19

*Ripa v. Stony Brook Univ.*, No. 17 Civ. 4941 (JMA) (SIL), 2018 U.S. Dist. LEXIS 98629 (E.D.N.Y. June 11, 2018) ........................................................................................................... 14

*Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129 (2d Cir. 1998) ............................................. 6

*Simon v. City of New York*, No. 17 Civ. 9575 (DAB), 2019 U.S. Dist. LEXIS 25331 (S.D.N.Y. Feb. 14, 2019) ........................................................................................................................... 23

*Sovak v. President of the Bd. of Educ.*, No. 97 Civ. 7407 (HB) (S.D.N.Y. Aug. 10, 1998) ........... 8

*Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259 (S.D.N.Y. 2014) ........................................ 6

*Steinberger v. Lefkowitz*, 634 F. App'x 10 (2d Cir. 2015) ........................................................... 7

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................................... 8

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) .. 2

*Wozniak v. City of New York*, 957 N.Y.S.2d 267 (Sup. Ct. N.Y. Cty. 2012) ............................... 14

*Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 831 F.3d 64 (2d Cir. 2016) .............. 20

**Statutes**

28 U.S.C. § 1367 .......................................................................................................................... 23

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ................................................. *passim*

N.Y. Pub. Auth. Law § 1203 ................................................................................................... 3, 4

New York City Human Rights Law, N.Y.C. Admin. Code tit. 8, § 101 *et seq.* .................... *passim*

Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ........................................................... *passim*

**Other Authorities**

Metro. Transp. Auth., About Us, https://new.mta.info/about-us/the-mta-network ................. 2, 21

Metro. Transp. Auth., Accessible Travel by Subway,
https://new.mta.info/accessibility/travel/subway ................................................................ 4, 17, 20

Metro. Transp. Auth., Advisory Committee for Transit Accessibility, https://new.mta.info/
accessibility/ACTA ........................................................................................................................ 5

Metro. Transp. Auth., Fast Forward: The Plan to Modernize New York City Transit (2018)... 4, 5

Metro. Transp. Auth., Guide to Access-A-Ride Service, http://web.mta.info/nyct/
paratran/guide.htm ....................................................................................................................... 21

Metro. Transp. Auth., MTA Guide to Accessible Transit, http://web.mta.info/accessibility ....... 21

Press Release, Metro. Transp. Auth., NYC Transit Releases Comprehensive Plan to Modernize
All Services for the 21st Century (May 23, 2018) ......................................................... 4, 5, 17, 20

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................................ 1, 6

**Regulations**

28 C.F.R. § 35.150 .......................................................................................................................... 19

28 C.F.R. § 41.57 ............................................................................................................................ 22

45 C.F.R. § 84.12 ............................................................................................................................ 19

45 C.F.R. § 84.22 ............................................................................................................................ 19

## PRELIMINARY STATEMENT

Plaintiffs bring this putative class action alleging that Defendants Metropolitan Transit Authority ("MTA"), New York City Transit Authority ("NYCT"), and the City of New York (the "City") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the § 504 of Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code tit. 8, § 101 *et seq.*, by denying them equal access to the New York City subway system.[1]  (*See* Am. Compl.)  For reasons explained below, Plaintiffs have failed to show that their alleged injury (i.e., the denial of equal access) is "fairly traceable" to any conduct by the City or that a judgment against the City would redress that injury, and Plaintiffs therefore lack standing.  Accordingly, this Court should dismiss Plaintiff's claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

To the extent that Plaintiffs' claims are not dismissed for lack of subject matter jurisdiction, they should be dismissed for failure to state a claim pursuant to Rule 12(b)(6), because Plaintiffs have failed to adequately allege that they were subject to discrimination under the ADA, Rehabilitation Act, or the NYCHRL.   While the denial of "reasonable accommodations" to persons with disabilities may constitute discrimination, under the ADA and Rehabilitation Act, an entity need not provide disabled persons with *equal* access to a particular portion of a program or service to provide such accommodations.  Rather, an entity need only provide *meaningful* access to the program or service *viewed in its entirety.*  As explained further

---

[1] Patrick Foye, in his official capacity as Chair and Chief Executive Officer of the MTA, and Andy Byford, in his official capacity as President of the NYCT, are also named as defendants.  (*See* Am. Compl., ECF No. 45, ¶¶ 33, 36.)  The Plaintiffs are Lisa Forsee, Vincent Russell, Jean Ryan, Brooklyn Independent Living Services ("BILS"), Brooklyn Center for Independence of the Disabled ("BCID"), Center for Independence of the Disabled – New York ("CIDNY"), Disabled in Action of Metropolitan New York ("DIA"), and the Harlem Independent Living Center ("HILC").  (*Id.* ¶¶ 25–29.)

below, the subway system is a part of a broader public transportation network operated by the NYCT and managed by the MTA.  Because Plaintiffs have not alleged facts that show that they were denied meaningful access to public transportation service, they have failed to state a claim under the ADA or Rehabilitation Act.

Although the NYCHRL has a broader definition of a "reasonable accommodation" than the ADA or Rehabilitation Act, because they have not alleged any facts that would warrant a different result under the NYCHRL than under the federal statutes, Plaintiffs' NYCHRL claim must fail as well.  In the alternative, because all of Plaintiffs' federal claims must be dismissed, this Court should decline to exercise supplemental jurisdiction over their NYCHRL claim.

## FACTUAL BACKGROUND

The New York City subway system is part of New York City's public transportation network, which is the largest transportation network in North America, serving a population of 15.2 million people in the 5,000 square mile area covering New York City, Long Island, southeastern New York State, and Connecticut.  (Am. Compl. ¶¶ 4, 31.)  The entire transportation network, which consists of subways, busses, and railroads, is operated by the MTA.  (*Id.* ¶ 31; *see also* Metro. Transp. Auth., About Us, https://new.mta.info/about-us/the-mta-network (last visited August 22, 2019) ("About MTA").[2])  The MTA and its subsidiary, the NYCT, are responsible for the management of the subway system, including its 472 subway stations.  (Am. Compl. ¶ 37.)  Since 1953, pursuant to an Agreement of Lease (the "Lease

---

[2] This Court may take judicial notice of information publicly announced on the MTA's website.  *See Indem. Ins. Co. of N. Am. v. Expeditors Int'l of Wash.*, No. 17 Civ. 2575 (JPO), 2019 U.S. Dist. LEXIS 26965, at *21–22 (S.D.N.Y. Feb. 19, 2019) ("[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.") (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015)) (alteration in original); *see also Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 79 N.E.2d at 477, 479 n.2 (N.Y. 2017) (citing the MTA's website).

Agreement"), the NYCT—and, upon its creation in 1965, the MTA—have leased the subway

stations from the City.[3]  (Am. Compl. ¶ 39; *see also* Decl. of Emily Burgess dated July 10, 2019,

Ex. 1 ("Lease Agmt."), ECF Nos. 38-1 & 38-2.[4])

      The Lease Agreement provides, in part, that "[t]he City leases to the [NYCT] . . . all of

the transit facilities now owned or hereafter acquired or constructed by the City, . . . transfers to

the [NYCT] title and ownership of the materials and supplies incidental to or necessary for the

operation of such transit facilities" and "authorizes the [NYCT] to take jurisdiction, control,

possession and supervision of such transit facilities, materials, supplies and property on the

effective date" of the Lease Agreement.  (Lease Agmt. § 2.1; *see also* N.Y. Pub. Auth. Law

§ 1203(1)(a) (permitting the City to enter the Lease Agreement).)  Additionally, the Lease

Agreement grants the NYCT "the use and possession of all real property owned or leased by the

City and used or occupied by the Board of Transportation . . . in connection with or incidental to

the operation of such transit facilities."  (Lease Agmt. § 2.2; *see also* N.Y. Pub. Auth. Law

§ 1203(1)(a).)  The Lease Agreement also provides that "upon the filing by the [NYCT] with the

Clerk of the City and the Secretary of State a copy of this Agreement, the [NYCT] shall take

possession and control of the Leased Property," as well as "all contracts, books, maps, plans,

papers and records of or in the possession of the Board of Transportation of whatever description

---

[3] As the New York Court of Appeals has explained, the "MTA is not a named party to the [L]ease
[Agreement] because that entity did not exist at the time NYCT[] and the City entered the [Lease]
[A]greement," but "NYCT[] is an affiliate of MTA pursuant to [§] 1263 of the Public Authorities Law,
added in 1965, which renders MTA the 'parent agency' of NYCT[]."  *Burlington Ins. Co.*, 79 N.E.3d at
479 n.2 (N.Y. 2017) (citations omitted).

[4] Although it is not attached to Plaintiffs' amended complaint, this Court may consider the Lease
Agreement in deciding this motion to dismiss because it is "incorporated into the complaint by reference"
and a "document[] possessed by or known to the [P]laintiff[s] and upon which [they] relied in bringing
the suit."  *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (citation and internal
quotation marks omitted).

incidental to or necessary for the operation of the facilities transferred by this Agreement." (Lease Agmt. § 2.3; *see also* N.Y. Pub. Auth. Law § 1203(5) (same).)  The Lease Agreement further provides that the NYCT "shall be responsible for the payment of, discharge of, defense against, and final disposition of, any and all claims, actions or judgments . . . resulting from any accident or occurrence arising out of or in connection with the operation, management and control by the [NYCT] of the Leased Property."  (Lease Agmt. § 6.8. )

On May 23, 2018, the NYCT announced the launch of "Fast Forward: The Plan to Modernize New York City Transit," a project to improve the subway system by focusing on four major priorities—one of which is "improving accessibility."  Press Release, Metro. Transp. Auth., NYC Transit Releases Comprehensive Plan to Modernize All Services for the 21st Century (May 23, 2018), *available at* http://www.mta.info/press-release/nyc-transit/nyc-transit-releases-comprehensive-plan-modernize-all-services-21st    ("Press Release").    To assist in implementing that priority, the NYCT has hired an Accessibility Advisor, who "reports[s] directly to [the] NYCT's President" and is "responsible for ensuring accessibility is considered and advanced across our transit system."  (*Id.*; Metro. Transp. Auth., Fast Forward: The Plan to Modernize   New   York   City   Transit   40   (2018)   ("Fast   Forward"),   *available   at* http://www.mta.info/press-release/nyc-transit/nyc-transit-releases-comprehensive-plan-modernize-all-services-21st).)

There are currently more than 100 accessible subway stations.  Metro. Transp. Auth., Accessible Travel by Subway, https://new.mta.info/accessibility/travel/subway (last visited August 22, 2019) ("Accessible Travel by Subway").  Under Fast Forward, "within five years, more than 50 new stations will be made accessible, ensuring that all subway riders will not be more than two stops away from an accessible station."  Press Release; *see also* Fast Forward at

39.  And "[w]ithin 10 years, this will expand to a total of more than 130 additional stations, with the balance of all possible stations completed by 2034."  Press Release; *see also* Fast Forward at 41.  The NYCT also plans to, among other things, "[r]evise maintenance practices to make elevators and wheelchair lifts more reliable," to "improve accuracy and availability of real-time information about elevators and escalators," and to "[p]rovide clear instructions about alternate routes in the event of an elevator closure, elevator breakdown, or other unexpected barrier to mobility."  Fast Forward at 43–44.  Additionally, the NYCT plans to improve the Access-A-Ride system by "simplifying the application process, using modern technology like GPS to enhance ride scheduling and tracking, and working with [the New York City Department of Transportation] to allow Access-A-Ride vehicles to use city bus lanes."  Press Release; Fast Forward at 42.

Additionally, in 2019, the NYCT held the first meeting of its Advisory Committee for Transit Accessibility, a "new, all-volunteer group of community members," many of whom have disabilities, who are "committed to working with [the NYCT] on a range of accessibility issues" by, among other things, "collect[ing] community and rider feedback on accessibility issues to share with [the] NYCT . . . on subways, buses, and Access-A-Ride paratransit" and helping the NYCT "develop new accessibility initiatives and promote[] these projects to the community." Metro. Transp. Auth., Advisory Committee for Transit Accessibility, https://new.mta.info/ accessibility/ACTA (last visited August 22, 2019).

Notwithstanding the NYCT's and MTA's demonstrated commitment to improving the accessibility of the network of transportation service that the NYCT provides, including the subway system, Plaintiffs allege that the NYCT, the MTA, and the City have violated the ADA, Rehabilitation Act, and NYCHRL because Plaintiffs are "being denied equal access to the New

York City subway system."  (Am. Compl. ¶ 2.)   To redress these alleged violations, Plaintiffs

request an order: (1) "enjoining Defendants from violating" and "requiring Defendants to change

their policies and practices so as to comply with" the ADA, the Rehabilitation Act, the NYCHRL

and "applicable regulations or standards"; (2) "requiring Defendants to install elevators or other

means of stair-free access in all renovated stations where doing so is both feasible and legally

required"; and (3) "declaring that Defendants' acts and omissions as challenged herein are

unlawful."  (*Id.* ¶¶ 254–56.)

## LEGAL STANDARDS

### I.   Dismissal Pursuant to Rule 12(b)(1)

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of

subject matter jurisdiction if . . . the plaintiff lacks constitutional standing to bring the action."

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416–17 (2d Cir. 2015).

Standing is "a requirement rooted in the traditional understanding of what it means to assert a

'case or controversy' under Article III" and "consists of three elements: the individual initiating

the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"

*Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (quoting *Spokeo Inc. v. Robbins*, 136 S. Ct.

1540, 1547 (2016)) (additional internal quotation marks omitted).  Each of these elements "must

be shown affirmatively, and that showing is not made by drawing from the pleadings inferences

favorable to the party asserting it."   *Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 267

(S.D.N.Y. 2014) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.

1998)); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("It is a long-settled

principle that standing cannot be inferred argumentatively from averments in the pleadings, but

rather must affirmatively appear in the record.").  When a plaintiff "does not clearly allege facts in his complaint demonstrating that [he] had standing at the critical time, [the plaintiff] fails to establish the court's jurisdiction over his matter." *Steinberger v. Lefkowitz*, 634 F. App'x 10, 12 (2d Cir. 2015).

## II.    Dismissal Pursuant to Rule 12(b)(6)

While a complaint need not contain "detailed factual allegations . . . , an unadorned, the-defendant-unlawfully-harmed-me accusation" is not enough.  *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Greene v. St. Barnabas Hosp.*, 727 F. App'x 21, 23 (2d Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  To be facially plausible, a claim must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  "'[N]aked assertion[s]'devoid of 'further factual enhancement'" will not suffice.  *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)).

When a complaint brings claims against multiple defendants, the facts alleged must also, "at a minimum, . . . give *each defendant* 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'"  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)) (emphasis added).  "[L]umping all the defendants together in each claim and providing no factual basis to distinguish their conduct, . . . fail[s] to satisfy this minimum standard."  *Id.*  A plaintiff must raise "more than a sheer possibility that a defendant has acted unlawfully," and when a complaint

"pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief'" and must be dismissed as to that defendant. *Gleason v. Scoppetta*, 566 F. App'x 65, 68 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678)).

## ARGUMENT

### I. This Court Lacks Subject Matter Jurisdiction

#### A. Plaintiffs Fail to Show Causation

As noted above, to establish standing, which is necessary for the exercise of subject matter jurisdiction under Article III, a plaintiff must show, among other things, that his alleged injury is "fairly traceable to the challenged conduct of the defendant." *Dhinsa*, 917 F.3d at 77. "The traceability requirement for Article III standing means that 'the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). When a plaintiff "fails to demonstrate how his alleged injuries are attributable to the defendants," the plaintiff has "failed to establish standing." *Sovak v. President of the Bd. of Educ.*, No. 97 Civ. 7407 (HB), 1998 U.S. Dist. LEXIS 12378, at *10 (S.D.N.Y. Aug. 10, 1998).

While "[a] plaintiff does not lack standing merely because her injury is an indirect product of the defendant's conduct, . . . it is . . . 'ordinarily substantially more difficult' to establish standing based on indirect injuries than on direct injuries." *Amnesty Int'l United States v. Clapper*, 638 F.3d 118, 141 (2d Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)), *rev'd on other grounds sub nom. Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). When, as here, "plaintiffs . . . allege that [third parties] . . . , are engaged in unlawful [conduct], the sufficiency of their causation pleading depends on its ability to support a

reasonable inference that defendants' actions had a 'determinative or coercive effect' on the [third parties] who carry out the alleged unlawful [conduct]." *Nat'l Council of La Raza v. Mukasey*, 283 F. App'x 848, 851–52 (2d Cir. 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Here, Plaintiffs have failed to establish causation, because Plaintiffs have not shown that the discriminatory conduct they allege—i.e., the "deni[al of] equal access to the New York City subway system" (Am. Compl. ¶ 2)—is "fairly traceable" to the City. *Dhinsa*, 917 F.3d at 77. Many of the factual allegations to support each of the claims in Plaintiffs' amended complaint "lump[] the defendants together and provide no factual basis to distinguish their conduct." *Atuahene*, 10 F. App'x at 34.

One of the few allegations in Plaintiffs' amended complaint that refers to the City individually states that "[a]s the owner of the subway system and the lessor of that system to the MTA, the City of New York cannot contract away its duty to ensure that the MTA does not perpetuate discrimination against individuals with disabilities while operating its programs." (Am. Compl. ¶ 197.)  However, for reasons explained below, Plaintiffs have failed to allege that the MTA discriminates against individuals with disabilities.  But even assuming that Plaintiffs had alleged that the MTA engages in discrimination, Plaintiffs have not alleged facts demonstrating that the subway system is part of any program operated by the City.  To the contrary, Plaintiffs allege that "the *MTA operates* the . . . transportation network" that the subway system is a part of and that the "*MTA* and *NYCT* are *responsible for the management* of New York City's subway system, including its 472 subway stations."  (Am. Compl. ¶¶ 31, 37 (emphasis added).)  Plaintiffs' citation to federal regulations defining the term "operates" to include "with respect to a fixed route . . . system, the provision of transportation service . . .

under a contractual or other arrangement or relationship with [a public or private] entity" does not constitute evidence to the contrary.   39 C.F.R. § 37.3.   To the extent that the Lease Agreement between the City and NYCT creates a relationship between the City and NYCT and/or MTA, that relationship does not give the City any control over the NYCT's and/or MTA's "provision of transportation service" through the subway system.[5]   *Id.*   In fact, the Lease Agreement expressly gives the NYCT "control, possession and supervision" of the subway system.  (Lease Agmt. § 2.1.)  The Lease Agreement does not state or imply that the City retains any control over that system upon the execution of the Lease Agreement.

Plaintiffs' assertion that the City should be liable based on a theory that "the City in fact retains control over . . . capital programs and . . . renovations" of the subway system" is also without merit, as the evidence cited in the amended complaint does not support their assertion. (Am. Compl. ¶ 163; *see also id.* ¶ 40 (same).)  First, Plaintiffs allege that one of the members MTA's Capital Program Review Board is "appointed by recommendation of New York City's Mayor" and "acts as the City's agent."  (*Id.* ¶ 165 (citing N.Y. Pub. Auth. Law § 1269-a & 1269-

---

[5] Plaintiffs citation to regulations implementing the ADA prohibiting discrimination by a "public entity in *providing any aid, benefit, or service*" through a "contractual, licensing, or other arrangement" fail for the same reason.  28 C.F.R. § 35.130(b)(1) (emphasis added); *see also* 28 C.F.R. § 41.51(b)(1)) (substantially identical language pertaining to a "recipient" of federal funding, rather than a "public entity"); Am. Compl. ¶¶ 196, 218 (citing same).)  It is the MTA and NYCT—not the City—that are providing subway service.  Plaintiffs' citations to subsections of the regulations prohibiting "substantial assistance" to an "agency, organization, or person that discriminates" are similarly unavailing, because the agency, organization or person must be "providing an[] aid, benefit, or service to beneficiaries of the *public entity's* program."  28 C.F.R § 35.130(b)(1)(v) (emphasis added)); *see also* 28 C.F.R. § 41.51(b)(1)(v) (substantially identical language referring to "the *recipient's* program") (emphasis added); Am. Compl. ¶¶ 198, 220 (citing same).)  Subway service is part of the MTA's program of transportation services—not the City's program.  Moreover, even if Plaintiff's complaint were construed to allege that the City has a role in providing a service related to the subway system managed by the MTA, Plaintiffs fail to demonstrate that the City provides the MTA or NYCT with "significant assistance."  As explained in greater detail below, the "assistance" that Plaintiffs identify—i.e., the City's contributions to the MTA's capital program—is not a "significant" portion of the funding for that program.  (*Id.* ¶¶ 198, 220.)

b).)  However, neither of the statutes that Plaintiffs cite states or implies that the person the mayor recommends is the City's agent, and the mere fact that the mayor recommends a particular person for appointment does not give rise to an agency relationship.  Indeed, the Mayor merely recommends that person to the Governor, who then either makes the formal appointment to the board or rejects the Mayor's recommendation.  *See* N.Y. Pub. Auth. Law § 1269-a(2).  Plaintiffs' "conclusory statement" that an agency relationship exists, which contains "no facts supporting that the conclusion," does not constitute even "a *prima facie* showing of agency."  *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998); *see also Anastasia Int'l, Inc. v. EM Online Pty Ltd.*, No. 13 Civ. 2919 (KBF), 2013 U.S. Dist. LEXIS 145482, at *6 (S.D.N.Y. Oct. 3, 2013) ("[C]onclusory allegations regarding [an] agency relationship . . . are not sufficient to survive a motion to dismiss.") (quoting *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 408 (S.D.N.Y. 2009)) (alteration and omission in original).

Even assuming that the member of the Capital Program Review Board recommended by the mayor were an agent of the City, the board has three other members, and approval of any proposed MTA capital program must be unanimous.  N.Y. Pub. Auth. Law § 1269-b(3).  Thus, while Plaintiffs suggest that the City could "use this veto power to exert control over Defendants MTA and NYCT" and "require that all proposed station alterations be completed in compliance with the ADA and [the Rehabilitation Act]," Plaintiffs are incorrect.  (Am. Compl. ¶ 167.)  This type of power would only permit the Mayor-recommended board member to *reject* a proposed capital program—not to cause MTA to propose a particular program.  Even if the Mayor-recommended board member continually rejected the MTA's proposed programs until the MTA proposed one that required the alterations Plaintiffs seek, the other three members of the Capital Program also possess full veto power and could reject the proposed program.  Thus, Plaintiffs'

allegation that the City has "veto power" does not establish that the City has control over the subway system.

Similarly, Plaintiffs' assert that the City has "the power to *reject* any [NYCT] capital project in excess of $1 million" and could use this power to "reject any proposed station renovation projects that do not provide people with disabilities with stair-free access." (*Id.* ¶¶ 169–70.)  But the power to *reject* a capital project is not equivalent to a power to cause the NYCT or MTA to propose or undertake any particular project.[6]  Moreover, to the extent Plaintiffs suggest that the City should use the funding it provides NYCT to encourage the NYCT and MTA to undertake projects that improve accessibility, Plaintiff's *own allegations* provide evidence that the City is *already doing so.*  As Plaintiffs note, "the City has recently directed $300 million toward 'critical station improvements at key locations sponsored by the City of New York,'" which include improvements "expressly intended to 'address station accessibility.'" (*Id.* ¶ 174.)

Additionally, Plaintiffs allege that the City "owns and controls the streets and sidewalks, and station renovations routinely require City permits, easements, or other approvals." (*Id.* ¶ 175.)  Plaintiffs vaguely suggest that the City could "us[e] these powers to ensure that the subway stations it owns are made accessible to the maximum extent feasible when altered." (*Id.* ¶ 176.)  But before the City can issue a permit, easement, or other approval, such an approval must be *requested* by the NYCT or the MTA, and the City has no ability to require the NYCT or MTA to make such requests.  Moreover, the mere fact that the City issues a permit, easement, or

---

[6] Indeed, the City's power to reject projects proposed by the NYCT is limited to those that are "estimated by the *authority* to involve an expenditure in excess of one million dollars."  N.Y. Pub. Auth. Law § 1203(b)(ii).  Thus, the NYCT could circumvent the City's rejection power by estimating that the cost of a proposed project will be less than $1 million.

other approval does not obligate the NYCT or MTA to actually undertake any particular project based on that approval.

Finally, Plaintiffs allege that the City "exerts control of [sic] the MTA through the power of the purse, because the NYCT must receive mayoral approval if it seeks to recover more than $5 million in capital costs from the City in any fiscal year," and note that "the Mayor routinely approves funding far in excess of this amount."  (Am. Compl. ¶¶ 171–72.)  But the amount of money that the City contributes to the MTA's capital program is only a small portion of the total. While Plaintiffs allege that "the City agreed to provide $2.5 billion toward the funding of the [MTA's] 2015-2019 Capital Plan," the 2015 press release that Plaintiffs cite indicates that the City's contribution was less than 10% of the total planned funding ($26.1 billion) for the program.   Press Release, Metro. Transp. Auth., Metropolitan Transportation Authority, Governor, Mayor, and MTA Chairman Announce Agreement on Funding for MTA Capital Program (October 10, 2015), *available at* http://www.mta.info/news/2015/10/10/governor-mayor-and-mta-chairman-announce-agreement-funding-mta-capital-program (last visited August 22, 2019).  Similarly, a May 21, 2019 Report to the New York City Council reflects that the amount that the City is ultimately expected to contribute ($2.666 billion) to the capital program is roughly only 8% of the total $33.6 billion.  Report to the Comm. on Fin. & Comm. on Transp. On the Calendar Year 2019 Adopted Budget and the Calendar Year 2015-2019 Capital Program for Metro. Transp. Auth. 1 (May 21, 2019), *available at* https://council.nyc.gov/budget/wp-content/uploads/sites/54/2019/05/MTA.pdf.  Thus, the City's ability to place conditions on the funding it provides to the MTA does not give it any real control over the MTA, the MTA's capital program, or the subway system.

Numerous courts have also recognized the City's lack of control over the subway system and, accordingly, have dismissed suits against the City premised on accidents stemming from its operation. *See, e.g.*, *Wozniak v. City of New York*, 957 N.Y.S.2d 267, 267 (Sup. Ct. N.Y. Cty. 2012) ("[T]he City, as an out-of-possession lessor of the subway system, . . . retain[s] no right to supervise or control its operation.") (quoting *Genco v City of New York*, 621 N.Y.S.2d 627, 627 (App. Div. 2d Dep't 1995)); *D'Avila v. City of New York*, 613 N.Y.S.2d 435, 436 (App. Div. 2d Dep't 1994) (noting "the City . . . relinquished all possession and control of the subway system to the NYCT[]" and finding that the City was not liable for an "accident caused by the NYCT[]'s own tools, equipment, or method of operation").

While the "requirement that a complaint allege[ ] an injury that is 'fairly traceable' to defendants' conduct . . . for [purposes of] constitutional standing" is a "lesser burden than the requirement of proximate cause" applicable in tort law, *Ripa v. Stony Brook Univ.*, No. 17 Civ. 4941 (JMA) (SIL), 2018 U.S. Dist. LEXIS 98629, at *12 (E.D.N.Y. June 11, 2018) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122 n.8 (2d Cir. 2003)) (additional internal quotation marks omitted), it requires a showing that the plaintiff's "injury was in some sense caused by the opponent's *action or omission*." *Cortlandt St. Recovery Corp.*, 790 F.3d at 417 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis added).

Here, the sole allegation in Plaintiffs' amended complaint that refers to specific conduct by the City does not provide any evidence of discrimination. Plaintiffs allege that the "New York City Department of Transportation [('DOT')] opposed installing elevators" in a particular subway station "because they believed that doing so would require 'changing the curb geometry' of a street that they were *already planning to rebuild*, and they were not willing to upset the 'current . . . budget and schedule' of that project." (Am. Compl. ¶ 177.) But while Plaintiffs

14

suggest that the City's response to the proposed project was intended to "stymie efforts to increase accessibility," (*id.* ¶ 176), the letter that Plaintiffs quote in part—when viewed in its entirety—makes clear that the opposite is true.  Plaintiffs fail to mention that the reason the DOT did not want to change the curb geometry was because it was "about to start construction on New Freedom safety improvements that cannot be redesigned within the current project budget and schedule."  (Decl. of Emily Burgess dated Aug. 22, 2019 ("Burgess Aug. 2019 Decl."), Ex. 1 ("DOT Letter").[7])  "New Freedom" is a reference to a program that "provided grants for services for individuals with disabilities that went above and beyond the requirements of the Americans with Disabilities Act."  N.Y.C. Dep't of Transp., Organization Management Plan 2013 79 (Feb. 13, 2013), *available at* http://www.nyc.gov/html/dot/downloads/pdf/2015-organizational-management-plan.pdf.  In other words, DOT's "opposition" to the proposed elevator site was based upon its concern for the impact that the elevator would have on DOT's existing plans to improve street and sidewalk accessibility for people with disabilities.

Moreover, the DOT did not simply state that the proposed site was unworkable; it also described two alternative proposals for the elevator—either an "upper elevator . . . located entirely above the expanded sidewalk" or a "street-level elevator on the future concrete island"—that may be compatible with the planned construction.  (DOT Letter at 1–2.)  The letter concludes by expressly stating that "it is especially important that an *ADA accessible path* is provided for *pedestrians with disabilities*." (*Id.* at 1 (emphases added).)  Thus, the letter that Plaintiffs cite actually demonstrates the City's concern for the needs of people with disabilities,

---

[7] Although the letter itself is not attached to Plaintiffs' amended complaint, this Court may consider the letter in deciding this motion to dismiss, because it is a document "incorporated into the [amended] complaint by reference" and "possessed by or known to [Plaintiffs] and upon which [they] relied in bringing the suit."  *Bartlett v. Honeywell Int'l, Inc.*, 737 F. App'x 543, 548 (2d Cir. 2018) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 140, 147 (2d Cir. 2007)).

not an intent to discriminate against them.  Thus, because Plaintiffs do not allege that the City engaged in any specific action or omission that "in some sense caused" Plaintiffs' injury, Plaintiffs fail to show causation and, as such, have failed to establish standing.  *Cortlandt St. Recovery Corp.*, 790 F.3d at 417.

### B.  Plaintiffs Fail to Show Redressability

In addition to showing that he has suffered an injury in fact that is fairly traceable to a defendant's conduct, to establish standing, a plaintiff must also show redressability.  *Dhinsa*, 917 F.3d at 77.  "Redressability requires that it 'be likely, as opposed to merely speculative, that [the plaintiff's alleged] injury will be redressed by a favorable decision.'"  *Lovell v. Consol. Edison Co. of N.Y.*, 758 F. App'x 222, 224 (2d Cir. 2019) (quoting *Lujan*, 504 U.S. at 561); *see also Linda R. S. v. Richard D.*, 410 U.S. 614, 618 (1973) (finding plaintiff lacked standing where "[i]f [the plaintiff] were granted the requested relief," the prospect that a particular outcome would occur "in the future, . . . can, at best, be termed only speculative").

Here, Plaintiffs' amended complaint requests an order: (1) "enjoining Defendants from violating" and "requiring Defendants to change their policies and practices so as to comply with" the ADA, the Rehabilitation Act, the NYCHRL and "applicable regulations or standards"; (2) "requiring Defendants to install elevators or other means of stair-free access in all renovated stations where doing so is both feasible and legally-required [sic]"; and (3) "declaring that Defendants' acts and omissions as challenged herein are unlawful."  (Am. Compl. ¶¶ 254–56.) However, Plaintiffs have failed to show that ordering the City to provide the relief they request will remedy their alleged injury (i.e., denial of equal access to the New York City subway system).[8]

---

[8] For the reasons explained *infra*, Plaintiffs have also failed to show that their alleged injury is a violation of the ADA, Rehabilitation Act, or NYCHRL.

First, as explained above, Plaintiffs have not alleged that the City has taken any action whatsoever—let alone any action that violates the ADA, the Rehabilitation Act, the NYCHRL or any other regulations or standards.  Nor have Plaintiffs otherwise identified any policies or practices the City has that violate those statutes or standards.  Thus, even assuming that their alleged injury is a violation of the statutes, regulations and/or standards that they cite, Plaintiffs have not shown that the requested declaration and injunction against the City would stop any ongoing violation or prevent such a violation from occurring in the future.

Second, an order requiring the City to install elevators or other means of stair-free access in subway stations when doing so is "feasible and legally-required [sic]" does not make it more likely that such access will be provided.  (Am. Compl. ¶ 255.)  Under the Lease Agreement, the City has transferred "control, possession and supervision" of the subway stations and "title and ownership of the materials and supplies incidental to or necessary for the operation of such transit facilities" to NYCT.  (Lease Agmt. § 2.1)  Plaintiffs acknowledge that the MTA and NYCT operate and manage the subway system, and do not allege that the City has any ability to control the actions that the MTA or NYCT take in doing so.  Moreover, as discussed above, there are currently more than 100 accessible subway stations, *see* Accessible Travel by Subway, and the NYCT and MTA have independently developed a plan to make more than fifty new stations accessible in less than five years, more than 130 stations accessible in less than ten years, and to achieve maximum possible accessibility in all stations by 2034.  Press Release.

Even if the City could take some action in an attempt to persuade or incentivize the MTA or NYCT to make additional improvements to the subway system or to speed up their timeline for making the planned improvements, that would be insufficient to establish redressability, because it would be "wholly speculative" whether such an "incentive" would be sufficient to

induce the NYCT or MTA to do so. *Citizens for Responsibility & Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174, 186 (S.D.N.Y. 2017); *see also Clapper*, 133 S. Ct. at 1141 (noting that courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers [sic] will exercise their judgment").

Because Plaintiffs have failed to show that granting the relief they request will redress their alleged injury—and because, as discussed above, they have failed to show a causal connection between that injury and any conduct by the City—Plaintiffs have failed to establish standing. Thus, Plaintiffs' claims against the City must be dismissed for lack of subject matter jurisdiction.

## II.    Plaintiffs Fail to State a Claim under the ADA or Rehabilitation Act

To state a claim for liability under Title II of the ADA or § 504 of the Rehabilitation Act, the plaintiff must show: "(1) that she is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (citation and internal quotation marks omitted). Here, because Plaintiffs have failed to show that they were discriminated against under the ADA or Rehabilitation Act, they have failed to state a claim.

Under both statutes, "a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). "Neither the ADA nor the Rehabilitation Act provides a closed-end definition of 'reasonable accommodation.'" *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995).

Instead, the ADA and regulations implementing the Rehabilitation Act provide a "non-exclusive list" of possible "reasonable accommodations," which "may include . . . making existing facilities . . . readily accessible to and usable by individuals with disabilities." *Id.* (quoting 42 U.S.C. § 12111(9)); *see also* 45 C.F.R. § 84.12(b) (similar).   However, the regulations implementing the ADA make clear that it "does *not* . . . necessarily require a public entity to make *each* of its existing facilities accessible to and usable by people with disabilities."   28 C.F.R. § 35.150(a) (emphasis added).   Rather, the ADA requires that a "service, program or activity, *when viewed in its entirety*," must be "readily accessible to and usable by individuals with disabilities." *Id.* (emphasis added).   The regulations implementing the Rehabilitation Act contain substantially similar language. *See* 45 C.F.R. § 84.22(a) (requiring a covered entity to "operate its program or activity so that when each part is viewed in its entirety, it is readily accessible to handicapped persons," but noting that this "does not require a recipient to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons").   Under this standard, "the [c]ourt must look at the accessibility of [a facility or program] as a whole, not at individual elements." *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 223 (S.D.N.Y. 1999) (citing 28 C.F.R. § 35.150(a)).   In other words, a covered entity "is not required to make each portion of the facility [or program] readily accessible; the issue is whether the facility [or program], when viewed in its entirety, is readily accessible." *Id.*

Moreover, the ADA and Rehabilitation Act "do not guarantee any particular level of [service] for disabled persons, nor assure maintenance of service previously provided." *Lincoln CERCPAC v. Health & Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998).   Rather, the statutes "require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided." *Wright v. N.Y. State Dep't of Corr. & Cmty.*

*Supervision*, 831 F.3d 64, 72 (2d Cir. 2016).  In adopting the "meaningful access" standard, the Supreme Court recognized "two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds"—and suggested that entities providing such access should strike a "balance" between them.  *Alexander v. Choate*, 469 U.S. 287, 299–301 (1985).  Accordingly, the Supreme Court "reject[ed] the boundless notion" that § 504 "reach[es] all action disparately affecting the handicapped," and noted that "meaningful access" does not require that disabled people receive "equal results from the provision" of a service or program.  *Id.* at 298–99, 304.

Here, Plaintiffs allege that they "are . . . being denied *equal access* to the New York City subway system."  (Am. Compl. ¶ 2 (emphasis added).)  But the Second Circuit has made clear that "meaningful access" is not synonymous with "equal access."  *Bernstein v. City of New York*, 621 F. App'x 56, 60 (2d Cir. 2015); *see also Baez v. N.Y.C. Dep't of Transp.,* No. 14 Civ. 2520 (LGS), 2015 U.S. Dist. LEXIS 77711, at *6 (S.D.N.Y. June 15, 2015) ("The ADA and its implementing regulations do not require equal access or equal results for individuals with disabilities; rather, those individuals must be provided with 'meaningful access' to a public entity's programs or activities.") (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 275 (2d Cir. 2003)).

Even if the Plaintiffs' amended complaint were construed to allege a denial of meaningful access, it would still fail.  As discussed above, more than 100 subway stations are currently accessible, *see* Accessible Travel by Subway, and the NYCT and MTA have plans to make fifty more stations accessible in less than five years, 130 more stations accessible in less than ten years, and to achieve maximum possible accessibility in all stations by 2034.  Press Release.  Moreover, the subway system does not exist in isolation—it is part of a much broader

"transportation network," which consists of subways, buses and railroads. (Am. Compl. ¶ 4; About MTA.) All of the approximately 5,725 buses operated by the MTA and in service are accessible and cover 2,952 miles of routes that reach the far ends of every neighborhood in the City. About MTA; Metro. Transp. Auth., MTA Guide to Accessible Transit, http://web.mta.info/accessibility (last visited August 22, 2019). Additionally, the MTA's Access-A-Ride Service covers any "destination within the service area covered by public buses and subways," and "[Access-A-Ride] fares are the same as full fare on public transit" (i.e., the buses and subways). Metro. Transp. Auth., Guide to Access-A-Ride Service, http://web.mta.info/nyct/paratran/guide.htm (last visited August 22, 2019). Plaintiffs do not allege that they have been denied access to buses or Access-A-Ride. In fact, the named individual Plaintiffs—one of whom is President of organizational Plaintiff DIA, (Am. Compl. ¶ 154)—expressly acknowledge that they regularly use those services. (*Id.* ¶ 132 ("Ms. Forsee . . . often takes a bus to either Court Square Station or 21st Queensbridge Station . . . ."); *id.* ¶ 141 ("Mr. Russell . . . relies on the bus or Access-A-Ride . . . ."); *id.* ¶ 147 ("Ms. Ryan . . . generally either use[s] Access-A-Ride or a bus . . . .").)

The allegations in the complaint concerning the remaining organizational Plaintiffs do not indicate whether their members use MTA buses or Access-A-Ride. However, the organizational Plaintiffs do not allege that their members are denied access to those services, and indicate that their members are able to travel to various destinations in the New York City metropolitan area. (*See id.* ¶ 158 (noting that BCID's office is "very close to the Borough Hall station" and that some "BCID staff . . . travel . . . to the Atlantic Avenue station, which is .7 miles, or 15 minutes, from BCID's office"); *id.* ¶ 159 (noting that "BILS' employees with mobility disabilities . . . travel throughout the Bronx on the subway system"); *id.* ¶ 160 (noting

that "CIDNY staff members, including staff members with mobility disabilities, travel throughout the City"); *id.* ¶ 161 (noting that HILC members have engaged in advocacy "at stations and at MTA Board meetings").)

Plaintiffs claim that other transportation options, such as the buses and Access-A-Ride are "inferior to the subway in terms of speed, reliability, convenience, cost, or some combination of the four."   (Am. Compl. ¶ 44.)   But "inconvenience is not a denial of access nor is it discriminatory."   *Baez*, 2015 U.S. Dist. LEXIS 77711, at *8 (citation omitted).   Similarly, allegations that other services may be more costly, slower, or less reliable do not provide evidence of discrimination, because the ADA and Rehabilitation Act require "reasonable accommodations"; a public entity "does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice."   *McElwee*, 700 F.3d at 641. Because the public transportation network operated by MTA and NYCT, when viewed in its entirety, is accessible to and usable by individuals with disabilities, Plaintiffs have failed to state a claim for a violation of the ADA or the Rehabilitation Act.

## III.   This Court Should Dismiss Plaintiffs' NYCHRL Claims or, in the Alternative, Decline to Exercise Supplemental Jurisdiction

The Second Circuit has explained that because "provisions of [the NYCHRL] are to be construed independently from similar or identical provisions of New York state or federal statutes, . . . courts must analyze NYCHRL claims separately and independently from any federal and state law claims."   *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted).   However, it has noted that "interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of [NYCHRL]." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).   Accordingly, when there are "no facts that would justify any different result under the NYCHRL," courts have

applied the same analysis to both NYCHRL and federal claims.  *Kreisler v. Second Ave. Diner Corp.*, No. 10 Civ. 7592 (RJS), 2012 U.S. Dist. LEXIS 129298, at *41 (S.D.N.Y. Sep. 10, 2012), *aff'd*, 731 F.3d 184 (2d Cir. 2013); *see also Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 643 (S.D.N.Y. 2013) (applying same standard to NYCHRL, ADA and Rehabilitation Act claims when the court had not "found any relevant difference between the analysis required by the NYCHRL and the analysis required by the federal laws of the question at issue here: whether the City discriminates against people with disabilities in its . . . program").

Here, as explained above, Plaintiffs have not alleged that the City failed to provide reasonable accommodations to people with disabilities under the ADA or Rehabilitation Act. Although "the NYCHRL defines 'reasonable accommodation' more broadly than the ADA" and Rehabilitation Act, *Simon v. City of New York*, No. 17 Civ. 9575 (DAB), 2019 U.S. Dist. LEXIS 25331, at *18 (S.D.N.Y. Feb. 14, 2019), it is "not boundless." *Id.* (quoting *LeBlanc v. UPS*, No. 11 Civ. 6983 (KPF), 2014 U.S. Dist. LEXIS 50760, at *39 (S.D.N.Y. Apr. 11, 2014)).  Plaintiffs have alleged "no facts that would justify any different result under the NYCHRL" than under than ADA or Rehabilitation Act.  *Kreisler*, 2012 U.S. Dist. LEXIS 129298, at *41.  Thus, for the same reasons that this Court should dismiss Plaintiffs' ADA and Rehabilitation Act claims, it should also dismiss Plaintiffs' NYCHRL claim.

In the alternative, this Court should "decline[] to exercise supplemental jurisdiction over [Plaintiffs' NYCHRL claim] once it "has dismissed [the ADA and Rehabilitation Act] claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also Klaper v. Cypress Hills Cemetery*, 593 F. App'x 89, 90 (2d Cir. 2015) (citing same and finding that where district court correctly dismissed plaintiff's ADA claim, it did not "err[] in declining to exercise supplemental

jurisdiction over his . . . NYCHRL claims; the district court was under no obligation to do so");

*Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 428 (S.D.N.Y. 2018) ("Courts in

this [d]istrict routinely decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL

claims after dismissing all federal claims.") (collecting cases).

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss Plaintiffs' amended complaint

should be granted.

Dated:        New York, New York
               August 22, 2019

                             ZACHARY W. CARTER
                             Corporation Counsel of the City of New York
                             *Attorney for Defendant City of New York*
                             100 Church Street
                             New York, New York 10007
                             (212) 356-1651
                             eburgess@law.nyc.gov

               By:     s/_____
                             Emily Burgess
                             Special Assistant Corporation Counsel
                             Martin Bowe
                             Senior Counsel