UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LISA FORSEE, JESSICA DE LA ROSA, JEAN
RYAN, BRONX INDEPENDENT LIVING
SERVICES, BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, CENTER
FOR INDEPENDENCE OF THE DISABLED, NEW
YORK, DISABLED IN ACTION OF
METROPOLITAN NEW YORK, HARLEM
INDEPENDENT LIVING CENTER, *on behalf of
themselves and all others similarly situated*,

                                                  Plaintiffs,

                    – against –

METROPOLITAN TRANSPORTATION
AUTHORITY, PATRICK FOYE, *in his official
capacity as chair and chief executive officer of the
Metropolitan Transportation Authority*, NEW YORK
CITY TRANSIT AUTHORITY, ANDY BYFORD, *in
his official capacity as president of the New York City
Transit Authority*, and THE CITY OF NEW YORK,

                                       Defendants.

**OPINION AND ORDER**

19 Civ. 4406 (ER)

Ramos, D.J.:

       Plaintiffs Lisa Forsee, Jessica De La Rosa, Jean Ryan, Bronx Independent Living

Services, Brooklyn Center for Independence of the Disabled, Center for Independence of the

Disabled, New York, Harlem Independent Living Center, and Disabled in Action of

Metropolitan New York (collectively the "Plaintiffs"), bring this action on behalf of themselves

and all others similarly situated, seeking injunctive and declaratory relief against Defendants

Metropolitan Transportation Authority (the "MTA"), Patrick Foye in his official capacity as

chair and chief executive officer of the MTA, New York City Transit Authority (the "NYCTA"),

Andy Byford in his official capacity as president of the NYCTA (together the "MTA

Defendants"), and the City of New York (the "City," and collectively "Defendants").  Plaintiffs allege in the instant action that Defendants have been renovating New York City subway stations without installing elevators or other stair-free routes in violation of the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act of 1973, and the New York City Human Rights Law ("NYCHRL").  Pending before the Court are the City's motion to dismiss and the MTA Defendants' motion for judgment on the pleadings.  The City moved to dismiss the action against it on the basis of lack of standing and failure to state a claim.  The MTA Defendants move for judgment on the pleadings, dismissing Plaintiffs' claims with respect to any subway station alterations that were completed more than three years prior to the commencement of this action, on the basis that they are barred by the statute of limitations.  For the reasons set forth below, the motion to dismiss is DENIED and the motion for judgment on the pleadings is GRANTED.

## I.  BACKGROUND

### A.  Factual Background

The three individual Plaintiffs, Lisa Forsee, Jessica De La Rosa, and Jean Ryan, live in various boroughs of the City and use either a walker or a power wheelchair for mobility.  *See* Second Am. Compl. (the "SAC"), Doc. 90 ¶¶ 21–24.  They travel throughout the City, but their ability to do so is severely limited by the continued inaccessibility of New York City's subway system, and by Defendants' practice of not adding accessibility features when they renovate stations in ways that affect their usability.  *Id*.  All of the five organizational Plaintiffs, Bronx Independent Living Services, Brooklyn Center for Independence of the Disabled, Center for Independence of the Disabled, New York, Harlem Independent Living Center, and Disabled in Action of Metropolitan New York, are non-profit groups that advocate for the independence of

people with disabilities, the removal of barriers to full equality and the elimination of discrimination. *Id.* ¶¶ 25–29. They each have members who are harmed by the inaccessibility of the City's subway system, which directly impacts their programs, missions, and resources. *Id.* ¶¶ 152–161.

The MTA, a public benefit corporation chartered by the New York State Legislature in 1968, operates the largest transportation network in North America, serving New York City, Long Island, southeastern New York State and Connecticut. *Id.* ¶ 30. Patrick Foye is the chair and chief executive officer of the MTA. *Id.* ¶ 32. The NYCTA, a subsidiary of the MTA, is also a public benefit corporation chartered pursuant to N.Y. Pub. Auth. Law § 1200 *et seq*. *Id.* ¶ 33. Andy Byford was, at the time of filing this complaint, the president of NYCTA. *Id.* ¶ 35. Together, the MTA and NYCTA are responsible for the management of the City's subway system, including its 472 subway stations. *Id.* ¶ 36. The City, a government entity, owns the New York City subway system and leases it to the MTA and NYCTA. All Defendants are recipients of federal financial assistance. *Id.* ¶¶ 37–38.

The subway is the backbone of New York City's transportation network. *Id.* ¶ 4. Millions of people rely on it every day to go to work, school, public services, shops, parks, places of entertainment, and social and cultural events. *Id.* However, nearly three decades after the passage of the ADA, less than 25 percent of New York City's subway stations are accessible to persons with mobility disabilities. *Id.* ¶ 5. According to Plaintiffs, this situation has continued for the past several decades because Defendants have consistently engaged in major renovation projects to improve station usability for nondisabled riders while systematically failing to install elevators or other stair-free routes. *Id.* ¶ 7.

Specifically, Defendants allegedly demolished and replaced staircases at seven subway stations without providing stair-free access: the Fort Hamilton Parkway Station; the 18th Avenue Station; the Kings Highway Station; the Avenue U Station; the 86th Street Station; the Bay Parkway Station; and the West 238th Station. *Id*. ¶¶ 85–91. In addition, Defendants constructed new staircases at the 30th Avenue Station, the Broadway Station, and the Broadway Junction Station without providing stair-free access. *Id*. ¶¶ 92–94. Defendants have also shut down 18 subway stations[1] to conduct extensive renovations without providing stair-free access. *Id*. ¶¶ 96–113. Defendants have shut down the 168th Street station to replace elevators that serve only customers who can use stairs,[2] without providing stair-free access. *Id*. ¶ 116. Defendants also allegedly plan to shut down both the 181st Street and the 191st Street stations to replace similar "non-ADA elevators" without providing stair-free access. *Id*. ¶ 119. Plaintiffs further allege that Defendants have announced a $43 million plan to renovate the Borough Hall station without any plan to provide stair-free access. *Id*. ¶ 114.

*Standing Allegations*

According to Plaintiffs, the City not only owns the subway system, but retains control over its capital programs, and particularly the renovations challenged here. *Id*. ¶ 163. First, the City's Mayor nominates for appointment one of the four voting members of the MTA's Capital Program Review Board (the "Review Board"), which must unanimously approve every MTA capital budget. *Id*. ¶ 164 (citing N.Y. Pub. Auth. Law § 1269 (a)(2) and (b)(3)). The voting

---

[1] They include the Bay Ridge Avenue Station, the 23rd Street Station, the 53rd Street Station, the 57th Street Station, the 72nd Street Station, the 86th Street Station, the 110th Street Station, the 145th Street Station, the 163rd Street Station, the 167th Street Station, the 174th Street Station, the 175th Street Station, the 30th Avenue Station, the 36th Avenue Station, the 39th Avenue Station, the Broadway station, the Sutter Avenue/Rutland Road Station and the Junius Street Station.

[2] These elevators are often separated from the platform by a final flight of stairs, which prevent people with disabilities from using the elevators. *Id*. ¶ 117. According to Plaintiffs, the MTA calls these elevators that do not form part of an accessible path of travel "non-ADA elevators." *Id*. ¶ 116.

member nominated by the City acts as the City's agent on the Review Board, and has the authority to unilaterally force reconsideration of, via a written disapproval, any bond resolutions, capital plans and amendments pertaining to the NYCTA.  *Id.* ¶¶ 165–66 (citing N.Y. Pub. Auth. Law § 1269(a)(2) and (b)(3)).  The City also retains the power to reject any NYCTA capital project estimated to cost over $1 million, if either the Mayor or a majority of the City Council finds the project "incompatible with sound planning for the development or redevelopment of the City."  *Id.* ¶ 169 (citing N.Y. Pub. Auth. Law § 1203(1)(b)(ii)).  Furthermore, the NYCTA must receive the City's approval if it seeks to recover more than $5 million in capital costs from the City in any fiscal year.  *Id.* ¶ 171.  According to Plaintiffs, the City routinely gives such approvals for requests far in excess of $5 million, but with strings attached.  *Id.* ¶ 172.  For example, the City expressly conditioned its agreement to provide $2.5 billion toward the funding of the NYCTA's 2015–2019 Capital Plan, on the condition that projects in the City will be planned in collaboration with the City's representatives on the MTA board.  *Id.*  The City has also recently directed $300 million towards several subway stations with the express intention to address station accessibility and other station issues.  *Id.* ¶ 174.  The City also owns and controls City streets, sidewalks, and other public properties, and station renovations routinely require City permits, easements, or other approvals.  *Id.* ¶ 175.  Lastly, Plaintiffs allege that the City has "historically stymied efforts to increase accessibility," one example of which is the City Department of Transportation's opposition to installing elevators as part of the Middletown Road station renovation in 2013, which is currently the subject of another litigation before this Court. *Id.* ¶¶ 176–177; *see also Bronx Indep. Living Servs. v. Metro. Trans. Auth.*, 358 F. Supp. 3d 324 (S.D.N.Y. 2019).

*The Lease Agreement*

The lease agreement between the City and the NYCTA regarding the subway system (the "Lease Agreement"), Doc. 38 Ex. 1 and 2, among other things, provides in section 2.1 that "[t]he City hereby leases to the [NYCTA]…for use…all of the transit facilities now owned or hereafter acquired or constructed by the City…. The City hereby authorizes the [NYCTA] to take jurisdiction, control, possession and supervision of such transit facilities." *Id*. Ex. 1 at 3. The Lease Agreement indicates that prior to the lease, the City's Board of Transportation was operating all the transit facilities. *Id*. at 2.

### B. Procedural Background

Plaintiffs commenced this action on May 15, 2019. Doc. 1. The MTA Defendants answered on July 10, 2019. Doc. 35. That same day, the City moved to dismiss for the first time. Doc. 36. At the pre-motion conference before this Court on August 1, 2019, Plaintiffs were granted leave to file an amended complaint, which they did on August 12, 2019. Doc. 46. On August 22, 2019, the City moved to dismiss again. Doc. 47. That same day, the MTA Defendants filed their answer to the amended complaint. Doc. 49. On November 22, 2019, the MTA Defendants moved for Judgement on the Pleadings. Doc. 75. On January 31, 2020, Plaintiffs requested by letter leave to file the second amended complaint to substitute an individual plaintiff, Vincent Russell, with Jessica De La Rosa, Doc. 88, which this Court granted, Doc. 89. On February 6, 2020, Plaintiffs filed the SAC, Doc. 90, and the MTA Defendants answered on February 20, 2020, Doc. 91.

The City moves to dismiss on the basis of lack of standing and failure to state a claim. The MTA Defendants move for judgment on the pleadings on the issue of the statue of limitations.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss under Rule 12(b)(1)

"'Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subjection matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'"  *Morrison v. Nat's Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citation omitted).  "Because standing is challenged on the basis of the pleadings, [the Court] accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [plaintiff]."  *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (citation and internal quotation marks omitted).  However, the burden remains on the plaintiffs, as the parties invoking federal jurisdiction, to establish their standing as the proper party to bring this action.  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (citation omitted); *see also FW/PBS, Inc. v. City Of Dallas*, 493 U.S. 215, 231 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record," and if the plaintiff fails to "clearly [] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute," he does not have standing under Article III (internal citations and quotation marks omitted)).

### B.  Motion to Dismiss under Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  However, a court is not required to credit legal conclusions, bare assertions or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To

survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Id*. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*. at 680 (quoting *Twombly*, 550 U.S. at 570).

### C. Motion for Judgment on the Pleadings under Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The Court applies the same standard of review to a Rule 12(c) motion as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Grp. Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)).

## III. DISCUSSION

Pending before the Court are the City's motion to dismiss on the basis of lack of standing and failure to state a claim, and the MTA Defendants' motion for judgment on the pleadings. Specifically, the City contends that Plaintiffs have failed to show either causation or redressability sufficient to establish Article III standing, or in the alternative, that Plaintiffs have failed to state a claim because they fail to show that they were discriminated against under the ADA or the Rehabilitation Act. The MTA Defendants contend that Plaintiffs' claims, to the

extent that they seek to challenge renovations completed more than three years prior to this action, are barred by the New York statute of limitations.  The Court addresses each motion in turn.

## A.  Article III Standing

"Article III, § 2, of the Constitution restricts the federal 'judicial power' to the resolution of 'Cases' and 'Controversies.'  That case-or-controversy requirement is satisfied only where a plaintiff has standing."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).  "[I]n order to have Article III standing, a plaintiff must adequately establish:  (1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Id*. at 273–74 (internal quotation marks and alterations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The Court is mindful that at the motion to dismiss stage, general factual allegations of standing may suffice because it is presumed at the pleading stage that general allegations contain those specific facts necessary to support the claim.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citing *Lujan*, 504 U.S. at 561).  Here, the City challenges the sufficiency of Plaintiffs' allegations only with respect to causation and redressability.  Specifically, the City contends that Plaintiffs have failed to show that their alleged injury, the denial of equal access to the New York City subway stations, is fairly traceable to the City's conduct, or that the injury will be remedied by a judgment against the City in this case.  In response, Plaintiffs contend that

their alleged injury is fairly traceable to the City's practice of permitting and approving subway renovations that are allegedly noncompliant with the ADA.

### *Causation*

The causation element of Article III standing requires that the plaintiff's injury be "fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court." *Carter*, 822 F.3d at 55. Although the City is correct that "much more is needed" to plead Article III causation when Plaintiffs' asserted injury flows from the government's allegedly unlawful regulation, or lack of regulation of, someone else, *Lujan*, 504 U.S. at 562, the Second Circuit has held that "indirectness [of the injury] is not 'necessarily fatal to standing.'" *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (internal citations omitted). Indeed, the causation element "does not create an onerous standard," and "requires less than that of proximate causation." *Carter*, 822 F.3d at 55 (internal citation omitted). A defendant's conduct that only injures a plaintiff indirectly, "after intervening conduct by another person, may suffice for Article III standing." *Id.* (internal citation omitted). Furthermore, courts within this Circuit have explained that "an omission may provide a basis for standing just as an affirmative action may." *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F.Supp.3d 541, 558 (S.D.N.Y. 2018) (internal citations omitted).

As an initial matter, Plaintiffs and the City fight over whether the City "operates" the subway system under Title II of the ADA. 28. C.F.R. § 35.150. The City contends that it is the MTA and the NYCTA that operate the subway system because the City has transferred control, daily operation, and management responsibilities of the subway system to the MTA and the NYCTA pursuant to the Lease Agreement. However, Plaintiffs' allegations that the City also operates the subway system is supported by implementing regulations promulgated by the United

States Department of Transportation (the "DOT"),[3] which interprets the ADA to define "operate" to include "the provision of transportation service by a public or private entity itself or *by a person under a contractual or other arrangement or relationship with the entity*." 49 C.F.R. § 37.3 (emphasis added). Here, there is no dispute that the City is a public entity within the meaning of the ADA, that the subway system is a fixed route service, and that the City, through its Board of Transportation, was operating its subway system prior to leasing it in 1953. There is likewise no dispute that if the City chooses to terminate the Lease Agreement, operation and management of the subway system reverts back to the City. Therefore, the City's relationship with the MTA and NYCTA, and the operation of the City's subway system, falls within the definition of "operate" under 49 C.F.R. § 37.3

The City's arguments that it does not "operate" its subway system because it plays no role in and exerts no control over the subway system are unpersuasive. While it is true that New York Public Authorities Law § 1204(8) confers to the NYCTA power to "construct, reconstruct, improve, maintain and operate any transit facility," § 1203, titled "Transfer of transit facilities by the [C]ity to the authority," states that the City "*may*…enter into an agreement" with the NYCTA for "the transfer to [the NYCTA]…of the transit facilities now owned…by the [C]ity," N.Y. Pub. Auth. Law § 1203 (1) (emphasis added). Furthermore, the Lease Agreement specifically authorizes the NYCTA "to take jurisdiction, *control, possession and supervision* of such transit facilities (all of the transit facilities now owned or hereafter acquired or constructed by the City)." *See* Doc. 38 Ex. 1 at 4 (emphasis added). Therefore, it is clear that while the New York Public Authorities Law granted the NYCTA with general powers, the City ultimately granted the specific authority to operate its subway system to the MTA Defendants.

---

[3] The DOT is the federal agency charged with implementing the transit-related provisions of Title II. *See* 42 U.S.C. § 12149.

In addition, Plaintiffs' allegations show that the City retains a significant degree of control over the subway system. First, the City owns the subway system and its transit facilities. The City also retains the ability to take back the "rights, powers, duties, liabilities and obligations of [NYCTA]," as provided in Article XVII of the Lease Agreement. *See* Doc. 38 Ex. 1 at 27.

Even under the current structure, Plaintiffs' remaining allegations show that the City enjoys significant influence over the MTA Defendants through its budgetary authority and veto power. This is particularly so with respect to capital projects like those at issue in this case. Most significantly, under N.Y. Pub. Auth. Law § 1203, the MTA and NYCTA must receive the Mayor's approval for requests seeking over $5 million in capital costs from the City in any fiscal year, and that they routinely seek funding "far in excess of this amount." Under that same section, the City has an independent power to reject any subway capital program that costs over $1 million if the Mayor finds that the project is incompatible with sound planning for the development or redevelopment of the City. In addition, the City has veto power over capital programs at NYCTA through its representative, one of the four voting members of the MTA's Capital Program Review Board, appointed on the City's nomination. Every capital plan undertaken by NYCTA requires unanimous approval of the Board, whose written disapproval could force reconsideration of the plan.

The City's primary contention that it can only incentivize but not induce the MTA Defendants to act understates its authority. First, the City could conceivably exercise its veto power to reject, and force reconsideration of, all of the challenged renovations at issue in this case, as well as any future proposed station renovations that the City deems discriminatory. Station renovations like the ones challenged here often cost tens of millions of dollars.[4]

---

[4] The complaint alleges consistently that station renovations often cost tens of millions of dollars For example, the renovation at Middletown Road Station in the Bronx allegedly cost $ 26.6 million dollars. The MTA allegedly

Furthermore, Plaintiffs' allegation that the City recently directed $300 million of the funding it provides the NYCTA towards certain subway stations to improve accessibility and other station issues clearly demonstrates the City's influence through its funding. Unable to circumvent this fact, the City responds by arguing that "to the extent Plaintiffs suggest that the City should use the funding it provides [NYCTA] to encourage the [NYCTA] and MTA to undertake projects that improve accessibility, Plaintiff's *own allegations* provide evidence that the City is *already doing so*," *see* City's Mem. at 12. However, the City's response directly undermines its own contention that it cannot induce the MTA or NYCTA to act.

The City also has the ability to impose conditions to its funding, as shown by the fact that the City's agreement to contribute $2.5 billion towards the MTA's 2015–2019 capital plan was expressly conditioned on, *inter alia*, that "Projects in the City…will be planned …in collaboration with the City representatives on the MTA board, with priority consideration given for projects and timing based on input from the City." The City's budgetary authority is not limited to its contributions to capital programs, but also to MTA's operating budget. A 2018 New York Times article (the "2018 Article") described a specific incident where the MTA delayed a vote on a $1 billion station improvement plan introduced by New York State Governor Andrew M. Cuomo due to the City's objection.[5] *See* Pls.' Mem. at 4 n.3. The City's deputy mayor at the time, Dean Fuleihan was quoted as saying that "[a]bout 70 percent of the $16

---

announced a $43 million plan to renovate Borough Hall station. The renovation of the Dyckman Street Station is also alleged to have cost tens of millions of dollars. Therefore, the City's contention that the MTA and NYCTA can somehow circumvent the City's veto power by estimating a renovation project to cost less than one million dollars is unsupported by the record.

[5] For purposes of the City's Rule 12(b)(1) motion, the Court may resolve any disputed jurisdictional fact issues by referring to evidence outside of the pleadings. *Zappia Middle East Constr. Co. Ltd. V. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). In its reply, the City fails to even address the 2018 article, much less oppose it.

billion of the MTA operating budget already comes from New York City payroll and other taxes," which the article confirmed using data from MTA.

Lastly, the MTA Defendants are keenly aware of the City's control. In the 2018 article, the MTA's chairman at the time, Joseph J. Lhota, was quoted "[t]he [C]ity (with its final veto power over the transit portion of the MTA's capital plan)…ha[s] the ultimate leverage…the ability to say no."

Accordingly, the Court concludes that Plaintiffs have met their burden here—which is relatively modest at the pleading stage—of alleging that their injury is fairly traceable to the City's failure to act. *See Bennett v. Spear*, 520 U.S. 154 (1997) (it is sufficient for a plaintiff to plead facts indicating that a defendant's actions had a "determinative or coercive effect upon the action of someone else" who directly caused the alleged injury); *see also Cortlandt Street Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 417 (2d Cir. 2015) ("[a] plaintiff…must establish…that the injury was in some sense caused by the opponent's action or omission") (internal citations omitted). The City's citation to several New York state court decisions do not suggest otherwise. As Plaintiffs correctly point out, those decisions involve tort liability, which requires a more demanding standard of causation, namely proximate causation, than that of Article III standing. *See, e.g., Wozniak v. City of New York*, 957 N.Y.S.2d 267, 2012 WL 2327677 at *2 (Sup. Ct. N.Y. Cty. 2012) (holding that the City cannot be held liable under a common-law theory of negligence for plaintiff's injuries); *D'Avila v. City of New York*, 613 N.Y.S.2d 435, 437 (N.Y. 2d Dep't 1994) (holding the city not liable for a wrongful death caused by the NYCTA's own tools, equipment, or method or operation).

### Redressability

To satisfy redressability, Plaintiffs must show that it is "likely, as opposed to merely speculative" that a favorable judicial decision will prevent or redress the injury." *See Lujan*, 504 U.S. at 560–61. However, it "is not a demand for mathematical certainty." *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 602 (2d Cir. 2016) (internal citation omitted). Furthermore, any relief provided need not be complete. "The redressability element of the Article III standing requirement and the 'complete relief' referred to by Rule 19 [of the Federal Rules of Civil Procedure] are not identical," *Lujan* 504 U.S. at 570 n.4 (emphasis omitted) (plurality opinion), and a plaintiff need not show that "a favorable decision will relieve his every injury," *Larson v. Valente*, 456 U.S. 228, 224 n.15 (1982).

As discussed above, the Court is satisfied that Plaintiffs' alleged injury will "likely" be redressed—*i.e.*, the MTA Defendants will undertake projects to improve station accessibility—if the City takes action towards it.

In any event, it appears from the complaint that some of the challenged renovations, though planned, have not commenced. The City's use of its leverage to influence those planned renovations, if they are ultimately determined to be discriminatory under the ADA, would immediately redress the discrimination that Plaintiffs are subject to. As this Court previously recognized, both the ADA and the Rehabilitation Act prohibit discrimination on the basis of disability, and a station renovation, if found to be noncompliant with 42 U.S.C. § 12149, "shall be considered discrimination." *See* 42 U.S.C. § 12132; 28 U.S.C. § 794(a); *see also Bronx Indep. Living Servs. v. Metro. Trans. Auth.*, 358 F. Supp. 324, 328 (S.D.N.Y. 2019) (explaining accessibility obligations in connection with alterations under 42 U.S.C. § 12149).

**B. Failure to State a Claim**

Next, the City argues that Plaintiffs fail to state a claim because they fail to show that they were discriminated against. To state a claim under Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff must allege: "(1) that [she] is a qualified individual with a disability; (2) the defendant is subject to one of the ADA; and (3) that [she] was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [he]r disability." *Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)); *see also Henrietta D.*, 331 F.3d at 272. (noting that the standard for Rehabilitation Act claims is generally the same as for ADA claims, with the additional requirement that defendants must receive federal funding). Here, only the third element is in dispute.

The City contends that Plaintiffs fail to show they were denied "meaningful access" to participate in the City's subway system. To be clear, "a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" *McElwee v. County of Orange*, 700 F.3d 635, 640–41 (2d Cir. 2012) (internal citations omitted). In addition, the relevant inquiry in examining a "reasonable accommodation" claim is whether a disabled plaintiff was "denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" *See id*. (citing *Henrietta D.*, 331 F.3d at 282.).

As this Court previously recognized in *Bronx Independent Living Services*, Section 12147 of Title II regulates the accessibility obligations of public entities making alterations to public transit facilities like subway stations. 358 F.Supp. 3d at 328; *see also* 42 U.S.C. § 12147(a). The

densely worded section provides that when a public entity makes alterations to an existing public transportation facility that affect or could affect the "usability" of a station or a part thereof,

> it shall be considered discrimination, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.

42 U.S.C. § 12147(a).

Plaintiffs have made specific allegations that Defendants made numerous station renovations without adding accessibility features. Courts within this district, including this Court, have recognized such "alteration" claims. *See De La Rosa v. Lewis Foods of 42nd Street, LLC*, 124 F.Supp. 3d 290 (S.D.N.Y. 2015); *see also Bronx Indep. Living Servs.*, 358 F.Supp. 3d at 328–29. As such, the City's argument that this "alteration" claim fails because Plaintiffs fail to show that they were denied meaningful access to the City's subway system, misses the point. For the foregoing reasons, the City's motion to dismiss Plaintiffs' claims under the ADA and Rehabilitation Act must be denied. As a result, it must likewise fail with respect to the NYCHRL, which offers broader protection than does the ADA. *See Loeffler v. Staten Island Univ. Hops.*, 582 F.3d 268, 278 (2d Cir. 2009) (describing the ADA as "a floor below which the City's Human Rights law cannot fall.") (citations and emphasis omitted). Accordingly, the City's Rule 12(b)(6) motion to dismiss is denied in its entirety.

### C. Motion for Judgment on the Pleadings

The MTA Defendants move for partial judgment on the pleadings under Fed. R. Civ. P. Rule 12(c) to dismiss Plaintiffs' claims to the extent that they seek to challenge subway renovations that were completed more than three years prior to May 5, 2019, as time-barred. Specifically, they argue that the "construction rule," under which alteration claims accrue or begin to run when the relevant alteration is completed, applies in this case. Therefore, because

New York's three-year statute of limitation for personal injury claims governs the instant ADA claims, Plaintiffs' claims regarding any station renovation completed over three years prior to the commencement of this action are time-barred. In response, Plaintiffs argue that the "construction rule" is inapplicable. They further contend that their claims implicating station renovations out of the limitations period are timely because both the "continuing violation" doctrine and the "repeated violations" doctrine should apply.

*The Construction Rule*

Section 12147 of Title II of the ADA regulates the accessibility obligations of public entities making alterations to public transit facilities like subway stations, and governs Plaintiffs' alterations claims in this case. That section provides that when a public entity makes an alteration to an existing public transportation facility, it "shall be considered discrimination, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, *upon the completion of such alterations*." 42 U.S.C. § 12147 (a) (emphasis added). Although the Second Circuit has expressly endorsed a three-year statute of limitation in New York-based ADA claims like the ones here, *see Purcell v. New York Inst. of Tech. – Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019), it has not had an opportunity to address when an ADA alteration claim like the ones in this case accrues.

Other courts have held that the statutory language of 42 U.S.C. § 12147 supports the application of the construction rule to determine the accrual date of an ADA alteration claim. *See Disabled in Action of Penn. V. SE Penn. Transp. Auth.*, 539 F.3d 199, 217 (3d Cir. 2008) ("SEPTA") (holding that the statute of limitations on claims under 42 U.S.C. § 12147 accrued

upon the completion of the alterations to the stations).  In SEPTA, the Third Circuit Court of Appeals interpreted the phrase "upon the completion of such alterations" as modifying the term "discrimination," such that discrimination occurs when the alteration is completed.  *Id*. at 211. ("[w]e thus interpret the 'upon the completion' clause as modifying the statutory definition of discrimination such that claims under § 12147(a) arise 'upon the completion' of inaccessible 'alterations').  Here, the Court agrees with the Third Circuit in *SEPTA* that the text of Section 12147 is clear that the term "upon completion of" modifies the term "discrimination" such that the act of discrimination occurs when the alteration is completed.

In addition, one other court in this district has similarly opined that the construction rule should apply to determine the accrual ADA alteration claims.  *See De La Rosa v. Lewis Foods of 42nd St., LLC*, 124 F. Supp. 3d 290, 300 (S.D.N.Y. 2015) ("The Court would therefore be inclined to adopt the construction rule.").  Although the court's discussion of the construction rule in that opinion was arguably dicta, the Court nevertheless finds its reasoning persuasive. Specifically, the Court noted that without the construction rule, operators of public accommodations would never have "the benefit of a statute of repose" as they could be dragged into the courts decades later for non–compliant alterations.  *Id*. at 300; *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.") (internal citations omitted).  That is exactly what Plaintiffs are asking for in this case.

Because it finds both *SEPTA* and *De La Rosa* persuasive, the Court holds that the construction rule applies to Plaintiffs' alteration claims.  *See Life Receivables Tr. v. Syndicate 102 at Lloyd's of London*, 549 F.3d 210, 216 (2d Cir. 2008) ("when a statute's language is clear,

our only role is to enforce that language according to its terms."). Therefore, Plaintiffs' ADA claims are dismissed to the extent that they challenge station renovations that were completed three years prior to May 5, 2019.

*The Continuing Violation Doctrine*

Next, Plaintiffs argue that their claims with respect to station renovations outside the limitations period are timely because they fall under the continuing violations doctrine. Specifically, Plaintiffs contend that they brought this lawsuit not to challenge a single inaccessible station renovation, but rather an ongoing discriminatory practice of failing to provide stair-free access by Defendants.

To establish a "continuing violation" in the Second Circuit, a plaintiff must allege a series of separate acts, some of which occur within the applicable statute of limitations, that collectively constitute one unlawful act. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (citing to *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 144 (2002)). In cases alleging a continuing violation, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of" the continuing violation. *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2002). However, the Second Circuit made clear that the doctrine cannot be applied when the plaintiff "challenges conduct that is a discrete unlawful act." *Shomo*, 579 F.3d at 181. (citing to *Morgan*, 536 U.S. at 117). This is because "discrete unlawful acts" are "easy to identify" and thus separately actionable. *See id*. at 181 (citations omitted); *see also Morgan*, 536 U.S. at 114. Courts in the Second Circuit have viewed the doctrine with disfavor. *See Stamm v. New York City Transit Auth.*, No. 04 Civ. 2163 (SLT) (JMA), 2013 WL 244793, at *8 (E.D.N.Y. Jan. 22, 2013) (internal citations omitted); *see also Trinidad v. N.Y.C. Dept. of Correction*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (collecting cases).

Here, the continuing violation doctrine is inapplicable because the alteration of a subway station is a discrete act. The only court to have addressed the "continuing violation" doctrine in the context of an alteration claim rejected its application on the basis that an alteration that is noncompliant with the ADA is more appropriately viewed as "a one-time discriminatory act." *De La Rosa*, 124 F. Supp. 3d at 300. Such an alteration is also easy to identify as it has a definitive beginning and end.

In response, Plaintiffs cite to *Stamm* for the proposition that the doctrine is available in a Title II ADA claim where specific and related instances of discrimination are combined with Defendants' failure to effect adequate remedies, with the result that these incidents continued to occur repeatedly and regularly. 2013 WL 244793 at *9 (internal citations omitted); *see also* Doc. 84 at 8–9. In *Stamm*, the plaintiff—a disabled individual with PTSD who relied on a service dog—alleged discrimination and retaliation based on the conduct of NYCTA employees who asked to see her service dog license in violation of the NYCTA's internal policy each time she boarded NYCTA buses. *See generally Stamm v. New York City Transit Auth.*, No. 04 Civ. 2163 (SLT)(JMA), 2011 WL 1315935 (S.D.N.Y. March 30, 2011). That decision, as the MTA Defendants correctly point out, does not support Plaintiffs' position. In fact, the Court in *Stamm* rejected the doctrine's application to the plaintiff's retaliation claim after concluding that a letter from the NYCTA denying the plaintiff's request for private access to an empty bus was a "discrete act." *Stamm*, 2013 WL 244793, at *11. The Court specifically noted that "discrete acts" that "fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Id*. at *11 (citing *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012)).

For the foregoing reasons, the continuing violations doctrine is inapplicable to Plaintiffs' claims.

*The Repeated Violations Doctrine*

Alternatively, Plaintiffs contend that the repeated violations doctrine applies here because inaccessible subway stations are present-day barriers that create new violations each day disabled passengers encounter them. Plaintiffs, while arguing that the plain language of the ADA makes clear that present barriers are actionable, rely on a provision in Title III of the ADA. *See* Doc. 84 at 10. (citing 42 U.S.C. § 12188(a)(1)). However, Plaintiffs' contention on the basis of that provision must be rejected because they have not asserted a Title III claim, nor could they do so because Title III does not apply to public entities like the MTA Defendants. *See Morales v. New York*, 22 F. Supp. 3d 256, 266 (S.D.N.Y. 2014) ("Title III expressly does not apply to public entities."). In addition, Plaintiffs' reliance on *Hamer v. City of Trinidad*, 924 F.3d 1093 (10th Cir. 2019) is misplaced. Under *Hamer*, the repeated violations doctrine, even where applicable, still limits the available claims to those raised within the applicable statute of limitations. *Hamer*, 924 F.3d at 1103.

Accordingly, Plaintiffs' resort to the continuing violation doctrine cannot save their ADA claims implicating alterations of stations outside of the limitations period.

*Practice Theory of Liability*

Lastly, Plaintiffs' argument that their claims should be timely because they are challenging the MTA Defendants' alleged practice of not providing accessibility features when renovating stations is without merit. As discussed above, because alterations of subway stations are discrete acts, they are not actionable if time barred. *See Morgan*, 536 U.S. at 113. This is so even if they were undertaken pursuant to a general policy that results in other discrete acts,

22

namely other subway station alterations, that are timely.  *See Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012).

*Remaining Claims*

Given that Plaintiffs' ADA alteration claims are subject to the construction rule, Plaintiffs' claims under the Rehabilitation Act are subject to the same limitation because the Rehabilitation Act adopted and incorporated the ADA's alteration requirements.  *See* Doc. 84 at 1 n.1; *see also Henrietta D.*, 331 F.3d at 272 (noting that the standard for Rehabilitation Act claims is generally the same as for ADA claims, with the additional requirement that defendants must receive federal funding).  Plaintiffs' NYCHRL claims are derivative of their federal claims because NYCHRL does not provide for an alteration theory of liability.  As such, Plaintiffs' NYCHRL claims, to the extent that they implication station alterations out of the limitations period, are dismissed as well.

## IV.  CONCLUSION

For the reasons set forth above, the City's motion to dismiss is DENIED, and the motion for judgment on the pleadings is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions, Doc. 36, 47, 70, and 75.

It is SO ORDERED.

Dated:  March 31, 2020
         New York, New York

_____
Edgardo Ramos, U.S.D.J.