UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JESSICA DE LA ROSA, JEAN RYAN, BRONX INDEPENDENT LIVING SERVICES, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, DISABLED IN ACTION OF METROPOLITAN NEW YORK, HARLEM INDEPENDENT LIVING CENTER, on behalf of themselves and all others similarly situated, | Case No.: 19-cv-4406 **THIRD AMENDED COMPLAINT** |

                                   Plaintiffs,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY, PATRICK FOYE, in his
official capacity as chair and chief executive
officer of the Metropolitan Transportation
Authority, NEW YORK CITY TRANSIT
AUTHORITY, ANDY BYFORD, in his
official capacity as President of the New York
City Transit Authority, and the CITY OF NEW
YORK.

                                   Defendants.

## **INTRODUCTION**

1. This class-action lawsuit challenges Defendants' ongoing discriminatory practice of renovating New York City subway stations without installing elevators or other stair-free routes in blatant violation of the Americans with Disabilities Act ("ADA").

2. Plaintiffs bring this action on behalf of people whose disabilities make the use of stairs difficult, dangerous, or impossible, and who are consequently being denied equal access to the New York City subway system.

3.  People with mobility disabilities[1] have been protesting the inaccessibility of the subway and the Metropolitan Transportation Authority's ("MTA's") practice of renovating stations without making them accessible for decades.

4.  The subway is the backbone of New York City's transportation network.  Millions of people rely on it every day to get to work, school, public services, shops, parks, places of entertainment, social and cultural events, and everything else the City has to offer.

5.  However, nearly three decades after the passage of the ADA, less than 25% of New York City's subway stations are accessible to persons with mobility disabilities—the lowest rate of any subway system in the United States. As a consequence, people with mobility disabilities are often excluded from the City's subway system entirely.

6.  Surprisingly, half of all neighborhoods served by the subway do not have a single accessible station.  Subway accessibility is especially absent in outer boroughs where a disproportionate number of people with disabilities live. These areas also have a proportionally higher population of low-income and non-white residents.

7.  This dire situation continues because for the past several decades, and in contradiction to the ADA's mandate, the MTA[2] has consistently engaged in major renovation projects to improve station usability for nondisabled riders—spending millions of dollars and closing stations for months to conduct the work—while systematically failing to install elevators or other stair-free routes.

---

[1] This group encompasses not only people who use wheelchairs, walkers, scooters, and other mobility devices, but also those who have heart or lung conditions, arthritis, or a host of other disabilities that make it difficult, dangerous, or impossible to use stairs.

[2] "MTA" will be used throughout to refer to all defendants.

8.  The ADA clearly states that when a public entity alters "an existing facility or part thereof" in a way that "affect[s] or could affect" usability, it must ensure that the altered portion is "*readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs*."[3]

9.  Failure to abide by this requirement is unlawful "discrimination" against people with disabilities.[4]

10.     There is no exception for cost: if a required access improvement is technically feasible, Defendants must make it.

11.     The MTA's repeated failure to do so, or even to adequately assess whether it could, is a longstanding and ongoing discriminatory practice that has played out in Manhattan, the Bronx, Brooklyn, and Queens.

12.     If the MTA had followed the law requiring it to install stair-free routes in these renovated stations whenever feasible, the New York City subway system would be much more accessible today.

13.     When it enacted the ADA in 1990, Congress observed that the law was "geared to the future—the goal being that, over time, access will be the rule rather than the exception"—and that "[i]t simply makes no sense to alter premises in a manner that does not consider access."[5]

14.      Nonetheless, the requirement that the MTA take all feasible steps to make its renovated stations accessible, which is rooted in this basic observation and congressional intent, has been ignored.

---

[3] 42 U.S.C. § 12147(a) (emphasis added); *see also*  49 C.F.R. § 37.43(a)(1).
[4] 42 U.S.C. § 12147(a).
[5] *See* H. Rep. No. 485(III), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 486.

15.     Accordingly, Plaintiffs bring suit to end the MTA's discriminatory practice of renovating stations without regard to accessibility, and to seek remediation for past violations, so that people with disabilities can use the subway system like everyone else.

## JURISDICTION

16.     This is an action for declaratory and injunctive relief brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

17.     Under 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over claims arising under the ADA and Section 504.

18.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the NYCHRL claim.

19.     Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to issue a declaratory judgment.

## VENUE

20.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because Defendants are located within this judicial district and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district.

## PARTIES

A.     **Plaintiffs**

i.)     Individual Plaintiffs

21.     Plaintiff Jessica De La Rosa lives in the Murray Hill neighborhood of Manhattan and uses a power wheelchair for mobility. Ms. De La Rosa travels throughout New York City, but her ability to do so is severely hampered by the continued inaccessibility of the New York City's

4

subway system, and by Defendants' discriminatory practice of not making legally required improvements when they renovate stations in ways that affect their usability.

22.     Plaintiff Jean Ryan lives in the Bay Ridge neighborhood of Brooklyn, and uses a power wheelchair to get from place to place because of a disability. Ms. Ryan travels throughout New York City, but her ability to do so is severely hampered by the continued inaccessibility of the New York City's subway system, and by Defendants' discriminatory practice of not making legally-required access improvements when they renovate stations in ways that affect their usability.

  ii.) <u>Organizational Plaintiffs</u>

23.     Bronx Independent Living Services ("BILS") is located in the Bronx.  It supports and advocates for the independence of people with disabilities throughout New York City. BILS' mission is to empower people with disabilities to live fully integrated lives in mainstream society, and the organization engages in regular advocacy, organizing, education, and outreach efforts to further this goal.  In addition, BILS staff members work directly with thousands of constituents each year, helping them to solve problems related to transportation, employment, housing, healthcare, education, and more

24.     Brooklyn Center for Independence of the Disabled ("BCID") is located in Brooklyn and supports and advocates for the independence of people with disabilities throughout the City. BCID's mission is to empower people with disabilities by improving their quality of life and fostering their integration into the mainstream of society, and the organization engages in regular advocacy, organizing, education, and outreach efforts to further this goal.  In addition, BCID's staff members work directly with thousands of constituents each year, helping them to solve problems related to transportation, employment, housing, healthcare, education, and more.

25.      Center for Independence of the Disabled – New York ("CIDNY") was founded in

1978 and has worked to make transportation accessible since its founding.  It has 40 years of

experience removing barriers to full equality, independence and self-determination.  It offers

education, legal assistance, benefits advisement and problem solving related to transportation,

health care, long-term care, employment, housing and homelessness, education and food. It

provides education on disability rights and disability literacy.  CIDNY researches, organizes, and

advocates for fair policies. It works with people in all five boroughs with offices in New York and

Queens counties. In 2018, CIDNY helped 52,310 people.

26.      Harlem Independent Living Center ("HILC") is located in Harlem and serves

people with disabilities in all of Northern Manhattan. The mission of HILC is to assist communities

of people with disabilities in achieving optimal independence through culturally and linguistically

appropriate services by advocating, educating, empowering, and being a community change

catalyst. HILC provides an array of independent living services to people with disabilities to

increase their ability to function independently within their community by providing them with

information and skills.

27.      Disabled in Action ("DIA") is a nonprofit civil rights membership organization

committed to ending discrimination against people with all disabilities. DIA has approximately 150

members who live and work in New York City. DIA consists primarily of and is directed by people

with disabilities. DIA works to eliminate the barriers that prevent people with disabilities from

enjoying full equality in American society. DIA seeks to empower people with disabilities to

become assertive and fully involved in self-advocacy. DIA promotes the ability of people with

disabilities to live independently by mandating equal access to education, employment,

entitlements, health care, housing, personal assistance services, public accommodations,

telecommunications, and transportation. DIA uses education and awareness, legislative advocacy, and public demonstrations to achieve these goals.

**B.**    **Defendants**

28.    Defendant MTA is a public benefit corporation chartered by the New York State Legislature in 1968 under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law § 1260 *et seq.*

29.    The MTA operates the largest transportation network in North America, serving a population of 15.2 million people in the 5,000 square mile area covering New York City, Long Island, southeastern New York State, and Connecticut.

30.    As of 2017, the MTA had an operating budget of $13 billion.

31.    Defendant Patrick Foye, sued in his official capacity, is the Chair and Chief Executive Officer of the MTA.

32.    Defendant New York City Transit Authority ("NYCT"), a subsidiary of the MTA, is a public benefit corporation chartered pursuant to N.Y. Pub. Auth. Law § 1200 *et seq.*

33.    As of 2017, the NYCT had an operating budget of $8.1 billion.

34.    Defendant Andy Byford, sued in his official capacity, is the President of NYCT.

35.    Together, defendants the MTA and NYCT are responsible for the management of New York City's subway system, including its 472 subway stations.

36.    Defendant City of New York ("the City"), as defined by the laws of the City of New York, is a government entity. As such, the City qualifies as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

37.    The City owns the New York City subway system and leases it to Defendants NYCT and MTA.

38.     The City has power to exercise control over capital planning for the subway system and to affect the accessibility of renovations within the subway system, and at times has actually exercised that control, through methods that are discussed in more detail below.

39.     All defendants are recipients of federal financial assistance to operate its transportation program and services within the meaning of Section 504 of the Rehabilitation Act.

## **FACTUAL ALLEGATIONS**

A.     **People With Disabilities Are Excluded from the Vast Majority of New York City's Subway System, and the Separate Transportation Systems that They Are Forced to Use Instead Are Inferior.**

40.     New York City's subway system—which is owned, constructed, maintained, and operated by Defendants—is a lifeline for both New Yorkers and visitors. For riders without disabilities, the subway is generally the fastest, cheapest, and most convenient way to get from point A to point B.  It connects millions of people each day to jobs, schools, parks, shops, cultural events, and every other aspect of City life.

41.     However, Defendants have failed to make the vast majority of this crucial transportation system available to people with mobility disabilities, thus making their daily lives dramatically more difficult.

42.     Moreover, the separate transportation systems that *are* somewhat more accessible to people with disabilities who cannot use stairs are far inferior to the subway in terms of speed, reliability, convenience, cost, or some combination of the four.

43.     For example, Access-A-Ride, the New York City paratransit service administered by the MTA, is a segregated system that allows people with disabilities only one guaranteed guest

per trip—meaning that those who use it must often travel in isolation from nondisabled friends, family, and peers.[6]

44.       Unlike the subway, which allows for flexible and spontaneous travel, Access-A-Ride is rigid: reservations must be made "one-to-two days in advance," and late cancellations or modifications can result in suspension. *Id.*

45.       The Access-a-Ride service is also often more delayed than the subways.

46.       Indeed, the MTA instructs Access-A-Ride customers to "[b]e prepared to wait *up to 30 minutes after* [their] scheduled pickup time" because vehicles that arrive within that window "*are considered on time.*"  *Id.* (emphasis added).

47.       Access-a-Ride is also often much slower than the subways.

48.       The MTA warns customers that even the shortest Access-a-Ride trips (those of 3 miles or less) may take almost an hour to complete. *Id.*

49.        On many occasions, Access-A-Ride does not provide transportation at all: a May 2016 report by the New York City Comptroller found that 31,492 people with disabilities were left stranded in 2015, because the Access-A-Ride vehicle that they had reserved simply did not show up.[7]

50.       The City bus system has different drawbacks than Access-A-Ride, but it is also worse than the subway in many ways. For example, while the subway system provides riders with rapid inter-borough transit 24 hours per day, the City bus system is predominantly local and limited:

---

[6] Metropolitan Transportation Authority, *Guide to Access-A-Ride Service*, *available at* http://web.mta.info/nyct/paratran/guide.htm (last visited August 8, 2019).

[7] New York City Comptroller, *Audit Report of the Metropolitan Transportation Authority's Oversight of the Access-A-Ride Program* at 10 (May 17, 2016) , *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/FK15_098A.pdf (last visited August 8, 2019).

most inter-borough trips require at least one transfer, and many lines stop running entirely for several hours each day.

51.     The bus system is also slower than the subway.

52.     According to a 2017 report by the New York City Comptroller, New York's bus system is "the slowest among the seventeen largest bus companies in the nation."[8]

53.     The same report noted that City bus routes are often "unreliable, long, meandering, confusing, congested, and poorly connected." *Id*. at 4.

54.     A trip by City bus will often take twice as much time—or more—than someone would need to complete the exact same trip by subway.

55.     Bus travel is often also more expensive than subway travel, often almost twice the cost.

56.     These separate and inferior systems are no substitute for the subway, and Defendants cannot avoid their obligation to operate the subway system itself in compliance with disability rights laws by arguing that they are.

**B.     Fewer than 25% of New York City's Subway Stations Are Accessible, and Defendants' Routine Failure to Comply with the Law when Renovating Stations Preserves this Discriminatory Status Quo.**

57.     Of the City's 472 subway stations, fewer than 25% are accessible to people whose disabilities make the use of stairs, difficult, dangerous or impossible.

58.     This makes New York City's subway system the least accessible system of any major U.S. city, by far.

---

[8] New York City Comptroller, *The Other Transit Crisis: How to Improve the NYC Bus System* 26 (November 2017) available at https://comptroller.nyc.gov/wp-content/uploads/documents/The-Other-Transit-Challenge.pdf (last visited August 8, 2019).

59.     The subway is even less accessible in the areas where large numbers of the City's disabled, elderly, non-white, and low-income residents reside.  For example, of Brooklyn's 159 subway stations, only 21 (13%) can be used by people whose disabilities make it difficult or impossible to use stairs.  In the Bronx, only 11 of 68 stations (16%) are accessible to people with disabilities.

60.     In contrast, Manhattan, with the lowest percentage of people with disabilities, and the lowest percentage of people living in poverty, has by far the highest percentage of accessible stations in the system—35%.

61.     Indeed, according to a recent report from the City's Comptroller, over half of the 122 neighborhoods served by the subway system lack a single accessible station,[9] and a recent New York Times analysis found that two-thirds of City residents with mobility disabilities (over 350,000 people) live far from an accessible station.[10]

62.     As a result of this rampant inaccessibility, people with disabilities are often either excluded from the subway system entirely or forced to take long, time-consuming detours to reach a station they can use (for example, taking a bus to an accessible station in the wrong direction, and then doubling-back)—an arduous and costly daily process that no nondisabled riders need to endure.

63.     In addition to excluding riders and would-be riders with disabilities, the inaccessibility of the New York City subway system adversely impacts many others who would

---

[9] New York City Comptroller, *Service Denied: Accessibility and the New York City Subway System* (July 17, 2018), https://comptroller.nyc.gov/reports/service-denied-accessibility-and-the-new-york-city-subway-system/

[10] Patel, Jugal K, New York Times, Where the Subway Limits New Yorkers With Disabilities (February 11, 2019), available at https://www.nytimes.com/interactive/2019/02/11/nyregion/nyc-subway-access.html

benefit from a more accessible system, such as parents with strollers, tourists and travelers with luggage, shoppers with heavy bags, and those with temporary injuries or illness.

64.     Inaccessible subways also negatively impact the City's many elderly residents—a large percentage of whom meet the definition of people with disabilities under the ADA, even if they do not self-identify as "disabled."

65.     As explained below, when Defendants renovate existing stations in ways that affect usability, as a matter of law, they have both an opportunity and obligation to make the station and its path of travel accessible to the maximum extent feasible. If Defendants complied with their legal obligation, they would dramatically improve subway access for people with disabilities,  while simultaneously making the subway safer and better for *all* riders.

66.     However, Defendants routinely fail to make required access improvements, or even to seriously *assess* what it would be feasible to do.

**C.     <u>Defendants Must Make All Feasible Access Improvements when Renovating Subway Stations and Station Pathways in Ways that Affect Usability, Without Regard to Cost.</u>**

67.     Title II of the ADA requires that when a public entity alters a public transit facility, such as a subway station, in a way "that affect[s] or could affect" usability, it must ensure that the alterations are made so that the facility is "*readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs*" "to the maximum extent feasible."  42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1).[11] The New York City Human Rights Law has even broader requirements. This requirement has been referred to as the "Accessible Alterations Rule."

---

[11] The phrase "maximum extent feasible" means that "all changes that are possible must be made," and is intended to provide exception only for "the occasional case in which the nature of an existing facility" makes full accessibility "virtually impossible." 49 C.F.R. Part 37, App. D.

68.     The Accessible Alterations Rule does not contain an exception for cost, meaning that if a required access improvement is technically feasible, it must be made.

69.     Moreover, the concept of "usability" is construed "broadly to include *any* change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities."[12]

70.     When station alterations affect the usability of a station as a whole, the *entire station* must be made accessible to the maximum extent feasible.

71.     Similarly, when such alterations make the pedestrian pathway into, out of, or through a station more usable (such as when existing stairs, escalators, or elevators are renovated or replaced) the entire path of travel must be made accessible, unless it would be technically infeasible to do so.

72.     Similarly, the Americans with Disabilities Act Standards for Transportation Facilities require that when Defendants place new station stairs where none existed previously, and make major structural modifications in order to do so, they must also provide an accessible path between the levels served by the new stairs.  ADA Standards for Transp. Facilities § 206.2.3.1. This rule, too, contains no exception for cost.  However, as explained below, despite the foregoing legal requirements, Defendants regularly install new station stairs without regard to this obligation.

---

[12] *See* Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed.Reg. 35,544, 35,581 (July 26, 1991) ("Title III Final Rule") (emphasis added); *see also* Department of Justice Title III Technical Assistance Manual at III-6.1000 (noting that replacement of flooring, installation of a new doorway, or relocation of a single electrical outlet may all be alterations that affect usability).

**D.**   **Defendants Have Long Failed to Abide by the Accessible Renovations Requirements of Disability Law When Renovating Stations and Station Pathways.**

73.     Defendants have regularly renovated New York City subway stations and station pathways without regard to the Accessible Alterations Rule for years, if not decades.

74.     The MTA has continued to flout the law when conducting station renovations despite multiple lawsuits challenging the practice and despite notice from the Federal Transit Administration, which administers the ADA, of its obligations.

75.     For example, between 2010 and 2011, Defendants spent tens of millions of dollars to renovate Dyckman Street Station in the Inwood neighborhood of Manhattan—a project that included the replacement of the station's stairs, but did not include any plan to provide an accessible path of travel for people with disabilities. It was only after a lawsuit was filed that Defendants installed an elevator between the street and the station's southbound platform, thus demonstrating that it had been feasible to make the station's renovated path of travel more accessible—as the Accessible Alterations Rule requires—all along.

76.     Similarly, in 2013, Defendants replaced every staircase at the Middletown Road Station in the Bronx—part of a massive $26.6 million project to renovate that station. Even though these renovations indisputably altered the station's path of travel (and the station itself) in ways that affected usability, Defendants again did nothing to make the station accessible to people whose disabilities make the use of stairs difficult, unsafe or impossible.

77.     In fact, when planning the Middletown Road project, the MTA did not even seriously *consider* ways to  make the station accessible to the maximum extent feasible, as the Accessible Alterations Rule requires. From the time it first began developing a plan for the renovation of Middletown Road in 2003, the MTA was clear that "no elevators [would] be provided

at this station," and Defendants did not perform an initial analysis of the feasibility of installing elevators there until April of 2013, a mere six months before construction began.

78.     Between 2003 and April of 2013—a period that encompassed virtually the entire planning process—Defendants made only what they described as a "very crude" "guesstimate" of whether they could make Middletown Road—or 34 other stations at which stair work was planned—accessible by installing elevators.

79.     More recently, as part of the then-planned shutdown of the L train for tunnel repair, Defendants planned to make major renovations to Manhattan's 14th Street/Sixth Avenue station—a transfer point for several subway lines (including the 1, 2, 3, F, L, and M) and the PATH train. Originally, Defendants had no plan or intention to install a stair-free route as part of these renovations. However, in response to a lawsuit, the MTA agreed to make the station fully accessible to people with disabilities by 2024—thus demonstrating, again, that it would have been feasible to make those access improvements in the first instance.

**E.** **Defendants Have Recently Renovated Dozens of Stations in Ways that Make Them More Usable, Without Making those Stations Accessible to People who Cannot Use Stairs Due to Disability.**

80.     People with mobility disabilities have been protesting the MTA's practice of renovating stations without making them accessible for decades. In fact, Plaintiffs' counsel sent the MTA a letter in September 2010 challenging the failure to implement access requirements when renovating subway stations and other access violations.

81.     More recently, in April 2018, Plaintiffs' counsel sent another letter on behalf of Plaintiffs and others with mobility disabilities, specifically requesting that the MTA put a stop to their discriminatory practice of renovating stations in ways that affect usability without also taking all feasible steps to provide a stair-free route, as required by the Accessible Alterations Rule.

82.     Despite these requests—and their longstanding legal obligation—Defendants continue to make major renovations that affect the usability of stations and station pathways without making those stations more accessible for people who cannot use stairs—and without even adequately assessing whether it would be feasible to do so.

83.     There are numerous recent instances of Defendants' discriminatory renovations, encompassing a variety of station renovation project scopes.

        i)  Demolition and Replacement of Subway Station Staircases

            *(1) Discriminatory renovations on the N Line in Brooklyn*

84.     Defendants demolished and replaced staircases at Fort Hamilton Parkway Station without providing stair-free access.

85.     Defendants demolished and replaced staircases at 18th Avenue Station without providing stair-free access.

86.     Defendants demolished and replaced staircases at Kings Highway Station without providing stair-free access.

87.     Defendants demolished and replaced staircases at Avenue U Station without providing stair-free access.

88.     Defendants demolished and replaced staircases at 86th Street Station without providing stair-free access.

89.     Defendants demolished and replaced staircases at Bay Parkway Station without providing stair-free access.

            *(2) Discriminatory renovations on the 1 Line in the Bronx*

90.     Defendants demolished and replaced staircases at West 238th Street Station without providing stair-free access.

ii)  <u>Construction of New Subway Station Staircases</u>

*(1) Discriminatory renovations on the N/W Line in Astoria, Queens*

91.  Defendants constructed a new staircase connecting the mezzanine to the street at 30th Avenue Station without providing stair-free access.

92.   Defendants constructed a new staircase connecting the Astoria-Bound platforms to the street at Broadway Station without providing stair-free access.

*(2) Discriminatory renovations on the J/Z/L Line in Brooklyn*

93.  Defendants are constructing two new staircases connecting the J/Z subway platforms to the L platform at Broadway Junction Station in Brooklyn but did not and are not providing stair-free access.

iii)  <u>Enhanced Station Initiative Renovations at Subway Stations</u>

94.  The MTA's $1 billion "Enhanced Station Initiative" project shut down 19 stations for months to make renovations such as new flooring, lighting, digital displays, glass barriers, handrails, stair treads, and more, but failed to make these stations accessible. Specifically:

*(1) Discriminatory renovations on the R Line in Brooklyn*

95.  Defendants shut down the Bay Ridge Avenue Station to conduct extensive renovations without providing stair-free access.

96.  Defendants shut down the 53rd Street Station to conduct extensive renovations without providing stair-free access.

*(2) Discriminatory renovations on the 3 Line in Harlem*

97.  Defendants shut down the 145th Street Station to conduct extensive renovations without providing stair-free access.

*(3) Discriminatory renovations on the C Line in Manhattan*

98.     Defendants shut down the 163rd Street Station to conduct extensive renovations without providing stair-free access.

*(4) Discriminatory renovations on the F Line in Manhattan*

99.     Defendants shut down the 57th Street Station to conduct extensive renovations without providing stair-free access.

*(5) Discriminatory renovations on the F/M Line in Manhattan*

100.    Defendants shut down the 23rd Street Station to conduct extensive renovations without providing stair-free access.

*(6) Discriminatory renovations on the B/D Line in the Bronx*

101.    Defendants shut down the 167th Street Station to conduct extensive renovations without providing stair-free access.

102.    Defendants shut down the 174th-175th Street Station to conduct extensive renovations without providing stair-free access.

*(7) Discriminatory renovations on the B/C Line in Manhattan*

103.    Defendants shut down the 72nd Street Station to conduct extensive renovations without providing stair-free access.

104.    Defendants shut down the 86th Street Station to conduct extensive renovations without providing stair-free access.

105.    Defendants shut down the 110th Street Station to conduct extensive renovations without providing stair-free access.

*(8) Discriminatory renovations on the N/W Line in Astoria, Queens*

106.    Defendants shut down the 30th Avenue Station to conduct extensive renovations without providing stair-free access.

107.     Defendants shut down the 36th Avenue Station to conduct extensive renovations without providing stair-free access.

108.     Defendants shut down the 39th Avenue Station to conduct extensive renovations without providing stair-free access.

109.     Defendants shut down the Broadway Station to conduct extensive renovations without providing stair-free access.

    i)     <u>Other Major Station Renovations That Did Not Provide Stair-Free Access</u>

110.     ESI is only one example of the MTA's discriminatory practice of making major renovations without providing stair-free access.  Other examples include:

*(1) Discriminatory renovations on the 3 Line in Brooklyn*

111.     Defendants shut down the Sutter Avenue/Rutland Road Station to conduct extensive renovations without providing stair-free access.

112.     Defendants shut down the Junius Street Station to conduct extensive renovations without providing stair-free access.

*(2) Discriminatory renovations on the 4/5 Line in Brooklyn*

113.     The MTA has announced a $43 million plan to renovate Borough Hall station, currently inaccessible for riders on the 4/5 Line traveling south.  Planned work includes stairway renovations and replacement, but the MTA has not publicly announced any plan to provide stair-free access.

*(3) Discriminatory renovations on the 6 Line in Manhattan*

114.     The MTA shut down the 28th Street Station to conduct extensive renovations without providing stair-free access for customers traveling northbound.

    i)     <u>Inaccessible Elevator Replacements at Subway Stations</u>

115.     The MTA is replacing more than a dozen elevators in stations that serve only customers who can use stairs.  (The MTA calls these elevators that do not form part of an accessible path of travel "non-ADA elevators.")

116.     A final flight of stairs to the platform forms a barrier for people with disabilities that the renovations will not touch, even though some of the stations will be closed for a full year for the work.

*(1) Discriminatory renovations on the 1 Line in Washington Heights, Manhattan*

117.     Defendants shut down the 168th Street Station to replace non-ADA elevators without providing stair-free access.

118.     Defendants plan to shut down the 181st Street Station to replace non-ADA elevators without providing stair-free access.

119.     Defendants plan to replace non-ADA elevators at 191st Street Station without providing stair-free access.

*(2) Discriminatory Renovations on the A Line in Washington Heights, Manhattan*

120.     Defendants plan to replace non-ADA elevators at 181st Street Station without providing stair-free access.

121.     Defendants plan to replace non-ADA elevators at 190th Street Station without providing stair-free access.

122.     In each of the above examples and in many other instances since the ADA was passed, the MTA did not provide stair-free access at these inaccessible stations during these renovations.  It apparently has not even evaluated whether doing so would be technically feasible.  Given that failure, the number of renovations, and the scale of the alterations already made, there can be little doubt that many or most were in fact technically feasible.

F.      **Defendants' Persistent Failure to Abide by the Accessible Alterations Rule Harms Plaintiffs and  Hundreds of Thousands of People With Disabilities Who Cannot Use Stairs.**

123.    Plaintiffs and other people with disabilities have been harmed by Defendants' discriminatory practice of not making feasible access improvements when they renovate stations and station pathways.

        i.)     Harm to Individual Plaintiffs

                *(1) Harm to Plaintiff Jessica De La Rosa*

124.    Plaintiff Jessica De La Rosa lives in the Murray Hill neighborhood of Manhattan and uses a power wheelchair to get from place to place. She has been harmed, and will continue to be harmed, by Defendants' ongoing failure to abide by the Accessible Alterations Rule and other ADA obligations. Ms. De La Rosa is 35 years old and has lived in Murray Hill for her entire life. Ms. De La Rosa travels throughout the City frequently in order to commute to her job as a Systems Advocate at BCID, visit family and friends throughout the five boroughs, go shopping, and attend doctor's appointments. Her ability to get around is severely constrained by the limited number of subway stations she can access.

125.    Ms. De La Rosa uses the subway at least three times a week and often more frequently. She would prefer to use the subway for all her travel but many locations she visits are not close to an accessible station so she must sometimes rely on the bus or Access-A-Ride, which are both inferior to the subway, for the reasons discussed above. Ms. De La Rosa also hates that, unlike the subway, she cannot board the bus independently and must be strapped and secured by the bus driver.

126.    Ms. De La Rosa's home is just .4 miles from the 28th Street Station on the 6 Line which is inaccessible for customers traveling northbound. Defendants closed the station from June 2018 to January 2019 to improve station access for customers without disabilities by repairing

structural steel, concrete, and stairways, adding new lighting, guardrails and railings, replacing and repairing, concrete platform floors, and adding new technological features like customer information screens, countdown clocks, Help Point intercoms and security cameras without providing stair-free access.

127.     In order to commute to work at BCID Ms. De La Rosa must roll 1.1 miles from her home to 14th Street – Union Square station where she travels on the N/Q line to Dekalb Avenue station, which is located .4 miles from BCID.

128.     For her job at BCID Ms. De La Rosa must travel throughout Brooklyn and into lower Manhattan for meetings with elected officials, the MTA, and constituents. Ms. De La Rosa's office is a just 0.2 miles from the partially inaccessible Borough Hall station. Ms. De La Rosa frequently attends morning MTA board meetings at 2 Broadway and then travels back to her office. If the MTA's renovation of the Borough Hall station had included accessibility improvements to accommodate customers traveling southbound on the 4/5 Line, this journey would take Ms. De La Rosa approximately 12 minutes via subway. Instead, she is often forced to spend money on taxis or push across the Brooklyn Bridge in order to get back to work.

129.     On one occasion in August 2019, Ms. De La Rosa had to travel from her office to the Broadway Junction subway station to attend a press conference with Brooklyn Borough President Eric Adams. If the MTA had included feasible accessibility improvements during its renovation of the Broadway Junction station this journey would have taken 23 minutes. As it stands, Google Maps currently states it cannot find an accessible way to travel between these two locations. Ms. De La Rosa had to hire a taxi driver who got lost, forcing Ms. De La Rosa to leave the taxi, reroute herself on a bus, and nearly miss the conference.

130.     Ms. De La Rosa also travels regularly to a doctor whose office is located at 59th and Madison. If the 6 Line was more accessible, including at 28th Street Station, Ms. De La Rosa's journey would take 21 minutes. Instead, she must roll a full two miles to doctor's appointments, including in inclement weather.

131.     The inaccessibility of the 28th Street Station harms Ms. De La Rosa when she goes to visit her boyfriend who lives close to the 3 Av-149 St Station in the Bronx. Because she cannot board the 6 Line at 28th Street and then switch to the 5 Line at Grand Central she instead must roll directly to Grand Central, a 1.1 mile push.

132.     If Defendants simply made feasible accessibility improvements when renovating stations and station pathways, as the law requires, many more stations would be accessible to Ms. De La Rosa, and it would be significantly easier for her to navigate the City.

          *(2) Harm To Plaintiff Jean Ryan*

133.     Plaintiff Jean Ryan lives in the Bay Ridge neighborhood of Brooklyn and uses a power wheelchair to get from place to place. She has been harmed, and will continue to be harmed, by Defendants' ongoing failure to abide by the Accessible Alterations Rule and other ADA obligations.

134.     Ms. Ryan has lived in Bay Ridge since 1972, and originally chose her home because of its proximity to the subway. Ms. Ryan travels throughout the City frequently, but she has been unable to use the subway stations in her neighborhood for over two decades because none of them are accessible.

135.     Ms. Ryan lives only blocks from the recently-renovated Bay Ridge Avenue station, where Defendants spent millions to install new flooring, lighting, digital displays, glass barriers, handrails, and stair treads, but did not install an elevator or otherwise take feasible steps to make the station accessible, as required by the Accessible Alterations Rule.

136.    Not only is the Bay Ridge Avenue station still inaccessible—so is every other R station for miles around. The nearest accessible subway stop along the R is 9 stops and four miles to the north, at Atlantic Avenue. To the south, there is nothing.

137.    As a result, when Ms. Ryan needs to get somewhere she must generally either use Access-A-Ride or a bus, both of which have significant shortcomings when compared to the subway. Indeed, the paratransit service Access-A-Ride must be requested at least a day in advance, making any spontaneous travel impossible. If a sudden transportation need arises, an appointment takes longer than expected, an event runs late, or there is any change of plans (even something as simple as deciding to get dinner after a movie), Access-A-Ride is not an option. The service is also notoriously often both late and slow, meaning that people who use it must build far more time into their schedule for transit than they otherwise would. The bus is more flexible, but service to Ms. Ryan's neighborhood is limited, such that if she needs to stay out late she may not be able to get home. It is also much farther from her house than the subway, over twice the cost: $6.75 per ride, and much slower.

138.    Ms. Ryan's inability to use the subway stations near her house is not just inconvenient: it also has the potential to be tragic. In April of 2016, Ms. Ryan's husband suffered a stroke, and was rushed to a hospital in Brooklyn. The next evening, Ms. Ryan's husband was transferred to a hospital in Manhattan. However, Ms. Ryan had no way to follow him: she could not schedule an Access-A-Ride on such short notice, and the bus was not running. Ms. Ryan was eventually able to contact a friend with a wheelchair-accessible van who drove all the way from Queens to pick her up and take her to the hospital. Because it was so difficult to get between that hospital and her home, Ms. Ryan was forced to stay in a hotel room for the duration of her husband's hospital stay – nearly a week.

139.     After being released from the hospital in Manhattan, Ms. Ryan's husband spent

months in recovery at NYU Langone Hospital in Brooklyn, and, because Ms. Ryan could not take

the subway between her home and the nearest R station (the recently-renovated 53rd street station,

which is still inaccessible), she had to wheel the entire way to the hospital whenever she wanted to

visit.

140.     Ms. Ryan's husband has had to return to NYU Langone or an adjoining

rehabilitation center several times since 2016, sometimes for weeks at a time.  Each time, the lack

of accessible subway stations has made Ms. Ryan's attempts to visit her husband vastly more

difficult. The inaccessibility of the subway system—including the continued inaccessibility of

renovated stations that should have been made accessible, such as those discussed herein—makes

every aspect of Ms. Ryan's daily life significantly more difficult than it should be, and routinely

forces her to find much less convenient alternate routes to meetings, appointments, social events,

family gatherings, and everywhere else she needs to go.

141.     If Defendants simply made feasible access improvements when renovating

stations and station pathways, as the law requires, many more stations would be accessible to Ms.

Ryan, and her ability to navigate the City—both in emergencies, and in response to the exigencies

of everyday life—would be much improved.

ii.)     <u>Harm to Organizational Plaintiffs</u>

142.     Each Organizational Plaintiff has members or constituents who have been harmed

by the MTA's discriminatory renovations practices.

143.     Each Organizational Plaintiff has also suffered direct harm as a result of those

practices. Defendants' discriminatory failure to abide by local and federal law when renovating

stations—as well as by the broad inaccessibility of the subway system as a whole, to which this

25

practice contributes—impacts the Organizational Plaintiffs' programs, frustrates their missions, and forces them to expend substantial resources.

144.    Organizational Plaintiff DIA is a nonprofit membership organization founded in 1970 that engages in activism, outreach, and advocacy aimed at eliminating discrimination against people with disabilities. Individual Plaintiff Ms. Ryan is the current President of DIA.

145.    DIA has advocated for increased subway access for decades, including protests of the MTA's inaccessible renovations at stations and at MTA Board meetings.  DIA has also participated in prior lawsuits about the MTA's inaccessibility. DIA officers and members have greater difficulty attending its monthly membership meetings because of inaccessible renovations.

146.    Organizational Plaintiffs BILS, BCID, CIDNY and HILC, all statutorily-defined Centers for Independent Living, are subject to the control of their constituents, and one of their core purposes is to engage in the sort of systems advocacy on their behalf that this lawsuit represents. See 29 U.S.C. § 796(a)(3) ( "consumer control") 29 U.S.C. §§ 705(17-18) (defining the "core services" and "services" of an independent living center).  The four Centers for Independent Living in this case are thus the functional equivalent of voluntary membership organizations.

147.    All four Centers for Independent Living employ staff members who work directly with thousands of constituents each year, helping them to solve problems related to transportation, employment, housing, healthcare, education, and more.  The majority of board members and employees for all four Centers for Independent Living are people with disabilities, as are nearly all of the people they serve.  Many of these individuals have mobility disabilities.

148.    BCID has protested the MTA's inaccessible renovations at stations and at MTA Board meetings.  BCID has also participated in prior lawsuits about the MTA's inaccessibility.  In addition, BCID's office is very close to the Borough Hall Station, which is inaccessible to

customers traveling southbound on the 4 and 5 lines.  Due to the limited accessibility of the

Borough Hall Station, BCID staff with mobility disabilities who are traveling further southbound

into Brooklyn for outreach events, client meetings, or for other constituent-related purposes must

travel instead to the Atlantic Avenue station, which is .7 miles, or 15 minutes, from BCID's office.

Defendants' failure to include accessibility improvements during the $43 million renovation of the

Borough Hall Station means BCID will continue to be forced to spend additional time and

resources traveling throughout the city: time that could otherwise be spent helping constituents or

engaging in other organization-related work.

149.     BILS has protested the MTA's inaccessible renovations at stations. BILS has

participated in prior lawsuits about the MTA's inaccessibility, including a prior lawsuit about the

MTA's inaccessible renovations. BILS' staff members, including staff members with mobility

disabilities, frequently travel from their office to various locations throughout the Bronx to conduct

outreach and provide trainings and information to local businesses. If Defendants had included

stair-free access during their renovation of the 174th-175th Street Station, BILS' employees with

mobility disabilities could walk or take a short bus ride to this station, a mile from BILS' office, and

then travel throughout the Bronx on the subway system. Instead, these employees must rely on

longer and less reliable methods of transportation, which takes time away from their core purpose

of helping constituents.  Defendants' failure to make the 174th-175th Street Station accessible also

harms BILS' constituents with mobility disabilities, who cannot use this station to visit BILS.

150.     CIDNY has protested the MTA's inaccessible renovations at stations and at MTA

Board meetings.  CIDNY has also participated in prior lawsuits about the MTA's inaccessibility.

CIDNY staff members, including staff members with mobility disabilities, travel throughout the

City to assist constituents.  Constituents seeking assistance from CIDNY live close to many of the

recently renovated stations mentioned herein.  CIDNY expends additional resources providing transportation for staff with mobility disabilities who must travel to locations that are nearby recently renovated inaccessible stations.  CIDNY has created maps comparing the location of accessible subway stations with locations that have a high population density of people with disabilities.

151.    HILC has protested the MTA's inaccessible renovations at stations and at MTA Board meetings.  HILC has participated in prior lawsuits about the MTA's inaccessibility.  HILC constituents, staff, and board have greater difficulty conducting organizational work because of the inaccessibility of the subway system.

152.    If Defendants simply made feasible access improvements when renovating stations and station pathways, as the law requires, many more stations would be accessible to the Plaintiffs, and their ability to navigate the City—with the same level of convenience and dignity that nondisabled New Yorkers enjoy—would be much improved.

G.      **In Addition to Owning the Subway System, Defendant City of New York Retains Significant Control over Its Capital Programs and Renovations.**

153.    In addition to owning the subway system, the City in fact retains control over its capital programs and particularly the inaccessible renovations challenged here. For example:

154.    The City's Mayor nominates for appointment one of the four voting members of the MTA's Capital Program Review Board, which must unanimously approve every MTA capital budget.  *See* N.Y. Public Authorities Law § 1269-a(2) and § 1269-b(3).

155.    The Capital Program Review Board member appointed by recommendation of New York City's Mayor acts as the City's agent on the Review Board.

156.    The City agent member can vote on any bond resolutions, capital plans, and amendments pertaining to the New York City Transit Authority and its subsidiaries and—via their

written disapproval—has the authority to unilaterally force reconsideration of such resolutions, plans, or amendments. *See id.* at § 1269-a(2) and § 1269-b(3).

157.    The City can use this veto power to exert control over Defendants MTA and NYCT, and over the subway system generally, and members of the Capital Program Review Board have repeatedly used their veto power (or the threat thereof) to demand specific changes to a capital plan.

158.    The City could use this veto power to require that all proposed station alterations be completed in compliance with the ADA and § 504, but it does not.

159.    Beyond this veto power, the City retains the independent power to reject any NYCT capital project estimated to cost in excess of $1 million, if either the Mayor or a majority of the City Council (formerly the "Board of Estimates") finds that the project is "incompatible with sound planning for the development or redevelopment of the City." *See* N.Y. Public Authorities Law § 1203(1)(b)(ii).

160.    The City could use this power to reject any proposed station renovation projects that do not provide people with disabilities with stair-free access—but, again, it does not.

161.    The City also exerts control of the MTA through the power of the purse, because the NYCT must receive mayoral approval if it seeks recover more than $5 million in capital costs from the City in any fiscal year. *See id.* at § 1203(1)(b)(i).

162.    The Mayor routinely approves funding far in excess of this amount, but with strings attached. For example, the City agreed to provide $2.5 billion toward the funding of the agency's 2015-2019 Capital Plan. This agreement was expressly "dependent upon" certain

conditions, including that: "Projects in the City . . . will be planned . . . in collaboration with the City representatives on the MTA board." [13]

163.     Indeed, Mayor de Blasio admitted that this "historic investment—the City's largest ever general capital contribution"—was contingent on "giving NYC riders and taxpayers a stronger voice." *Id.*

164.     In addition, the City has recently directed $300 million toward "critical station improvements at key locations sponsored by the City of New York."[14]  The "sponsored station" projects funded with this money are expressly intended to "address station accessibility, crowding, and other stations issues and support the economic development and affordable housing strategy of the city of New York." *Id.*

165.     Finally, the City owns and controls City streets, sidewalks, and other public properties, and station renovations routinely require City permits, easements, or other approvals.

166.     Rather using these powers to ensure that the subway stations it owns are made accessible to the maximum extent feasible when they are altered, the City has historically stymied efforts to increase accessibility.

167.     For example, the New York City Department of Transportation opposed installing elevators as part of the Middletown Road station renovation discussed above, because they believed that doing so would require "changing the curb geometry" of a street they were *already planning to*

---

[13] *See* Metropolitan Transportation Authority, *Governor, Mayor, and MTA Chairman Announce Agreement on Funding for MTA Capital Program* (October 10, 2015), *available at* http://www.mta.info/news/2015/10/10/governor-mayor-and-mta-chairman-announce-agreement-funding-mta-capital-program (last visited August 8, 2019).

[14] *See* Metropolitan Transportation Authority, *Capital Program 2015-2019 Amendment No. 3* (2018) at 31 *available at* http://web.mta.info/capital/pdf/April_2018_Amendment_Approved_Optimized (last visited August 8, 2019).

*rebuild*, and they were not willing to upset the "current . . . budget and schedule" of that project for the sake of station accessibility.

## CLASS ACTION ALLEGATIONS

168.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), named Plaintiffs Jessica De La Rosa, Jean Ryan, BILS, BCID, CIDNY, DIA, and HILC bring this action for injunctive and declaratory relief on their own behalf, on behalf of the constituents of organizational plaintiffs BILS, BCID, CIDNY, HILC and the members of organizational Plaintiff DIA, and on behalf of all persons similarly situated.

169.     The class that Plaintiffs seek to represent is composed of all people whose disabilities make use of stairs difficult, dangerous, or impossible, and who have been discriminated against as a result of the MTA's failure to improve stair-free access when doing renovations as required by disability laws.  This includes individuals who use, have used, or who have attempted to use the subway system, as well as those who have been and/or are being deterred from such use as a result of the lack of accessible stations that results from the MTA's inaccessible renovations.

170.     The claims asserted herein are solely for injunctive and declaratory relief for class members; damage claims are not included in this complaint.

171.     The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and  the Court. Census Data indicates that 553,064 non-institutionalized New York City residents have a mobility-related disability.  The Mayor's Office for People with Disabilities estimates that that approximately seven million of the City's visitors during 2017 were individuals with a disability and that roughly 99,000 wheelchair users reside in the five boroughs of New York City.

172.     There is a well-defined community of interest in the questions of law and fact involved affecting the persons to be represented in that they are all being subjected to

discrimination in the New York City subway system, as well as to individual renovated stations that should have been made more accessible.

173.     Common questions of law and fact predominate, including, but not limited to, whether Defendants' ongoing failure to make feasible stair-free access improvements in the course of renovating stations and station pathways or installing new station stairs—or to seriously and/or adequately evaluate the feasibility of such improvements—violates disability rights laws.

174.     Plaintiffs are adequate class representatives because they, or the persons they serve, are directly impacted by Defendants' consistent failure to make feasible stair-free access improvements in the course of renovating stations and station pathways and installing new station stairs, or to seriously and/or adequately evaluate the feasibility of such improvements. Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the class as a whole.

175.     The attorneys representing the class are highly trained, duly qualified, and very experienced in representing plaintiffs in civil rights class actions for injunctive relief.

176.     Plaintiffs' claims are typical of the claims of the class as a whole because Plaintiffs are similarly affected by the violations described herein.

177.     Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole.

178.     References to Plaintiffs shall include each Plaintiff and each member of the class, unless otherwise indicated.

## FIRST CAUSE OF ACTION
Violation of Title II of the Americans with Disabilities Act
(42 U.S.C. § 12131, *et seq.*)

179.     Plaintiffs re-allege and incorporate herein all previous paragraphs of the Complaint.

180.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in or otherwise benefiting from its programs, or otherwise discriminating against a person on the basis of disability: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

181.     Title II of the ADA also requires public entities, including Defendants, to operate each of their programs, services, or activities so that "when viewed in its entirety, [it] is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149 & 35.151.

182.     The term "disability" includes physical and mental conditions that substantially limit one or more major life activities.  42 U.S.C. §§ 12102(1-2).

183.     A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

184.     The named Plaintiffs; the board members, staff, and constituents of organizational Plaintiffs; and the class members are persons with disabilities within the meaning of the statute, in that they have conditions that substantially limit one or more major life activities, such as walking.

They are also qualified in that they live in, work in, and/or travel to New York City, and thus are eligible to benefit from Defendants' subway service.

185.    A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).  Defendants MTA and NYCT are public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

186.    Furthermore, in providing any aid, benefit, or service, a public entity "may not, directly or through contractual, licensing, or other arrangements, on the basis of disability":

- "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. 35.130(b)(1)(ii);

- "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. 35.130(b)(1)(iii)

- "Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program." 28 C.F.R. 35.130(b)(1)(v); or

- "Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. 35.130(b)(1)(vii).

187.    As the owner of the subway system, and the lessor of that system to the MTA, the City of New York cannot contract away its duty to ensure that the MTA does not perpetuate

discrimination against individuals with disabilities while operating its programs. *See* 28 C.F.R. §

35.130(b)(1); *see also* 49 C.F.R. § 37.3 (defining "operates," in the context of a "fixed route

system," to include "the provision of transportation service by a public or private entity itself o*r by*

*a person under a contractual or other arrangement or relationship with the entity*") (emphasis

added).

188.     In addition to the direct participation in the discriminatory conduct described

above, the City also provides "significant assistance" to Defendants MTA and NYCT—including

$2.5 billion in funding for the most recent capital plan alone—and it is liable for the discriminatory

conduct of Defendants MTA and NYCT on that basis alone. *See* 28 C.F.R. 35.130(b)(1)(v).

189.     Where a public entity alters all or part of an existing transit facility in ways that

"affect or could affect the usability of the facility or part thereof," it must ensure that *the altered*

*portion itself* is "readily accessible to and usable by individuals with disabilities, including

individuals who use wheelchairs" to the "maximum extent feasible." 42 U.S.C. § 12147(a); 49

C.F.R. § 37.43(a)(1); *see also* 49 C.F.R. § 37.3 (defining "alteration" to include "remodeling,

renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in

structural parts or elements, and changes or rearrangement in the plan configuration of walls and

full-height partitions"). Failure to do so constitutes discrimination, under the ADA. *See* 42 U.S.C.

§ 12147(a)

190.     When such alterations affect the usability of a station as a whole, the entire station

must be made accessible to the maximum extent feasible. *See* 42 U.S.C. § 12147(a); 49 C.F.R. §

37.43(a)(1);

191.     Similarly, when such an alteration makes the pedestrian pathway into, out of, or

through a facility more usable (such as when existing stairs, escalators, or elevators are renovated or

replaced) the facility's entire path of travel accessible must be made accessible, unless it would be technically infeasible to do so. *See* Federal Transit Administration, "Circular C 4710.1 – 'Americans With Disabilities Act (ADA): Guidance'" (November 4, 2015) at § 3.4.3.

192.     The stations described herein are "facilit[ies] . . . used in the provision of designated public transportation services" within the meaning of 42 U.S.C. § 12147(a).

193.     By consistently renovating stations or station pathways in ways that affect usability but failing to make altered areas accessible to the maximum extent feasible, Defendants violate the ADA. *See* 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1).

194.     In addition, Defendants' routine failure to even adequately *assess* whether access improvements are feasible in such situations is an independent violation of the ADA. *See id*; *see also Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 375 (2d Cir. 2008) (a court's feasibility inquiry asks whether an entity made "maximally feasible efforts to achieve the requisite level of accessibility").

195.     Moreover, to be considered "readily accessible to and usable by individuals with disabilities" under the above provision, a transportation facility or part thereof must meet *both* the requirements of the Department of Transportation's implementing regulations, 49 C.F.R. Part 37, and the technical scoping requirements of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), 36 C.F.R. Part 1191 Appendix B, as modified by the Department of Transportation (hereinafter, the "DOT Standards"). *See* 49 C.F.R. § 37.9(a); *see also* 49 C.F.R. 37, App. A (DOT modifications to ADAAG).

196.     This includes the requirement that when installing new stairs where none existed previously, and making major structural modifications in order to do so, Defendants must also

provide an accessible path between the levels served by the new stairs. 36 C.F.R. Part 1191, App. B

at § 206.2.3.1.

197.     Defendants' persistent failure to install elevators or a stair-free accessible route

(or to seriously evaluate the feasibility of doing so) when renovating stations or station pathways in

a way that affects usability—both in the stations specifically named here, and more generally—

constitutes an ongoing violation of the ADA.

198.     Unless restrained from doing so, Defendants will continue to violate the law.

199.     Through their conduct, Defendants have caused and will continue to cause

Plaintiffs immediate and irreparable injury.

200.     Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

42 U.S.C. § 12133.

**SECOND CAUSE OF ACTION**
Violation of Section 504 of the Rehabilitation Act of 1973
29 U.S.C. § 794 *et seq.*

201.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the

Complaint.

202.     Section 504 of the Rehabilitation Act of 1973 provides that "no otherwise

qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C.

§ 794(a).

203.     Plaintiffs; the board members, staff, and constituents of organizational Plaintiffs;

and members of the putative class are otherwise qualified individuals with disabilities within the

meaning of Section 504, in that they have impairments which substantially limit one or more major

37

life activities, such as walking, and have reason to and are otherwise eligible to participate in Defendants' subway services.  *See* 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102).

204.     Defendants are recipients of federal financial assistance within the meaning of Section 504, and have received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

205.     Defendants MTA and NYCT are instrumentalities of the New York State government.

206.     All of the operations of Defendants, including the New York City subway system, are "program[s] or activit[ies]" within the meaning of the Rehabilitation Act.  29 U.S.C. § 794(b)(1)(A).

207.     In addition to prohibiting recipients of federal funding from discriminating directly against people with disabilities, Section 504 prohibits discrimination that occurs through a "contractual, licensing, or other arrangement" with another entity. *See* 28 C.F.R. § 41.51(b)(1).

208.     Section 504's provisions prohibiting discrimination through a "contractual, licensing, or other arrangement" state that it is unlawful to:

- "Afford a qualified handicapped person an opportunity to participate in or benefit from [an] aid, benefit, or service that is not equal to that afforded others;"

- "Provide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;"

- Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that

discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipient's program;" or to

- "Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." *See* 28 C.F.R. §§ 41.51(b)(1)(ii, iii, iv, vii).

209.    As a recipient of federal funds, the City must ensure that people with disabilities have nondiscriminatory access to the subway system that it owns, and that it still exerts substantial control over. Section 504 is clear that City cannot insulate itself from this responsibility just because that system is operated through a contractual or other relationship with Defendants MTA and NYCT. *See id.*

210.    In addition to the direct participation in the discriminatory conduct described above, the City also provides "significant assistance" to Defendants MTA and NYCT—including $2.5 billion in funding for the most recent capital plan alone—and it is liable for the discriminatory conduct of Defendants MTA and NYCT on that basis alone. *See* 28 C.F.R. § 41.51(b)(1)(v).

211.    The U.S. Department of Transportation regulations implementing Section 504 provide that "[n]o qualified person with a disability shall, solely by reason of his disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance administered by the Department of Transportation."  49 C.F.R. § 27.7(a).

212.    The prohibition on discrimination in the U.S. Department of Transportation regulations applies to "any aid, benefit, or service provided in or through a facility that has been constructed, expanded, altered, leased or rented, or otherwise acquired, in whole or in part, with Federal financial assistance."  49 C.F.R. § 27.7(b)(6).

213.    For entities receiving Federal financial assistance from the Department of Transportation, compliance with the Department of Transportation's ADA regulations is also a condition of compliance with section 504 of the Rehabilitation Act of 1973.  49 C.F.R. § 37.21(b).

214.    Where a public entity alters all or part of an existing transit facility in ways that "affect or could affect the usability of the facility or part thereof," it must ensure that it is "readily accessible to and usable by individuals with disabilities" to the "maximum extent feasible." 42 U.S.C. § 12147(a); 49 C.F.R. 37.43(a)(1); *see also* 49 C.F.R. § 37.3 (defining "alteration" to include "remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions").

215.    Similarly, when such an alteration makes the pedestrian pathway into, out of, or through a facility more usable (such as when existing stairs, escalators, or elevators are renovated or replaced) the facility's entire path of travel accessible must be made accessible, unless it would be technically infeasible to do so. *See* Federal Transit Administration, "Circular C 4710.1 – 'Americans With Disabilities Act (ADA): Guidance'" (November 4, 2015) at § 3.4.3.

216.    Defendants' ongoing failure to comply with this obligation – or to even adequately assess whether doing so is possible – constitutes discrimination under § 504. *See* 49 C.F.R. 37.43(a)(1); *see also* 49 C.F.R. § 37.3.

217.    To be considered "readily accessible to and usable by individuals with disabilities" under the above provision, a transportation facility or part thereof must meet *both* the requirements of the Department of Transportation's implementing regulations, 49 C.F.R. Part 37, and the technical scoping requirements of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), 36 C.F.R. Part 1191 Appendix B, as modified by the Department of

Transportation (hereinafter, the "DOT Standards"). *See* 49 C.F.R. § 37.9(a); *see also* 49 C.F.R. 37, App. A (DOT modifications to ADAAG).

218.     This includes the requirement that when installing new stairs where none existed previously, and making major structural modifications in order to do so, Defendants must also provide an accessible path between the levels served by the new stairs. 36 C.F.R. Part 1191, App. B at § 206.2.3.1.

219.     Defendants' persistent failure to install an accessible route (or to even seriously evaluate the feasibility of doing so) between the levels served by newly-installed stairs—both in the stations specifically named here, and more generally—constitutes an ongoing violation of Section 504. *See* 42 U.S.C. § 12147(a); 49 C.F.R. 37.43(a)(1); 36 C.F.R. Part 1191, App. B at § 206.2.3.1; *see also* 49 C.F.R. §§ 27.7(b)(1)(i-ii).

220.     As a direct and proximate cause of the aforementioned acts, Plaintiffs have been and will continue to be injured.

221.     Defendants' conduct constitutes an ongoing and continuous violation of Section 504. As a result, Plaintiffs are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION
Violation of the New York City Human Rights Law
(N.Y.C. Admin. Code § 8-101 *et seq.*)

222.      Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

223.     The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee

of any place or provider of public accommodation because of any person's actual or perceived . . .

disability . . . directly or indirectly, to refuse, withhold from or deny to such person the full and

equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages,

facilities or privileges of the place or provider of public accommodations . . ."

224.     The term "person" includes corporations. N.Y.C. Admin. Code § 8-102(1).

225.     The MTA is a public benefit corporation and thus is a person within the meaning

of N.Y.C. Admin. Code § 8-102.

226.     Likewise, NYCT is a subsidiary of the MTA, and thus is also a person within the

meaning of N.Y.C. Admin. Code § 8-102.

227.     The City of New York is also a "person" within the meaning of this law.

228.     Defendants Foye and Byford are being sued in their official capacities as the

chairman of the MTA and the president of NYCT, respectively.

229.     The term "place or provider of public accommodation" includes "providers,

whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or

privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities,

accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise

made available." N.Y.C. Admin. Code § 8-102.

230.     New York City's subway stations – including those discussed herein – are public

accommodations within the meaning of the NYCHRL because they are places where the MTA and

NYCT offer the general public access to their program of subway services.

231.     As persons within the meaning of the NYCHRL, Defendants act as the

"managers" of the subway system, and of the stations discussed herein.

232.     In so doing, Defendants have denied the accommodations, advantages, facilities, and privileges of these stations (and of the subway system as a whole) to people with disabilities, for the reasons set forth herein.

233.     The NYCHRL further requires that "it is an unlawful discriminatory practice for any person prohibited by the provisions of this section from discriminating on the basis of disability not to provide a reasonable accommodation to enable a person with a disability to … enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of the NYCHRL.

234.     Defendants qualify as covered entities, and must make reasonable accommodations necessary to allow persons with disabilities the opportunity to benefit from Defendants' subway program pursuant to N.Y.C. Admin. Code § 8-107(15).

235.     Defendants have made inadequate or no reasonable accommodations to allow persons with disabilities the opportunity to use the services offered at the renovated stations discussed herein.

236.     The NYCHRL further provides that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter." N.Y.C. Admin. Code § 8-107(17).

237.     Defendants policies and practices described herein, including the policy of stairway renovation without providing stair-free access, result in a disparate impact to the detriment of persons with disabilities.

238.     As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

239.     Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL.  Unless restrained from doing so, Defendants will continue to violate said law, and this conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

240.     In the absence of an injunction, Plaintiffs will suffer irreparable harm because they will continue to be discriminated against and denied the accommodations, advantages, facilities, and privileges of Defendants' discriminatory alterations policy and practice.

241.     Defendants have also failed to make reasonable accommodations that would provide Plaintiffs with the opportunity to benefit from Defendants' subway program.

242.     Thus, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on their own behalf and on behalf of the class, pray for the following relief against Defendants:

243.     That this matter be certified as a class action with the class defined as set forth above, that Plaintiffs be appointed class representatives, and their attorneys be appointed class counsel;

244.     For an order and judgment enjoining Defendants from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law or applicable regulations and standards, and requiring Defendants to change their policies and practices so as to comply with the above, including (but not limited to) the obligation set forth in 36 C.F.R. Part 1191, App. B, § 206.2.3.1;

245.     For an order requiring Defendants to install elevators or other means of stair-free access in all renovated stations where doing so is both feasible and legally-required;

246.     For an order and judgment declaring that Defendants' acts and omissions as challenged herein are unlawful;

247.     For an award of Plaintiffs' reasonable attorneys' fees and costs; and

248.     For such other relief that the Court may deem just and proper.

Dated:  October 29, 2020                Respectfully submitted,
       New York, New York

_____
Rebecca Rodgers
Jelena Kolic
Chloe Holzman
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636
rrodgers@dralegal.org

Daniel L. Brown
SHEPPARD MULLIN RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY  10112
Tel:  (212) 634-3095
Fax:  (212) 655-1768
dlbrown@sheppardmullin.com

*Attorneys for Plaintiffs*