UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSICA DE LA ROSA, JEAN RYAN, BRONX INDEPENDENT LIVING SERVICES, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, DISABLED IN ACTION OF METROPOLITAN NEW YORK, HARLEM INDEPENDENT LIVING CENTER, on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>-against-<br><br>METROPOLITAN TRANSPORTATION AUTHORITY, JANNO LIEBER, in his official capacity as chair and chief executive officer of the Metropolitan Transportation Authority, NEW YORK CITY TRANSIT AUTHORITY, RICHARD DAVEY, in his official capacity as President of the New York City Transit Authority, and the CITY OF NEW YORK.<br><br>　　　　　　Defendants. | No. 19-cv-4406 (ER) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' UNOPPOSED MOTION FOR
FINAL APPROVAL OF SETTLEMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION................................................................................................. 1

II.     BACKGROUND OF THE CASE AND PROCEDURAL HISTORY ............................ 3

III.    SUMMARY OF THE SETTLEMENT AGREEMENT .................................................. 5

    1.  Maximum Accessibility ................................................................. 6

    2.  Funding .......................................................................................... 6

    3.  Renovations................................................................................... 8

    4.  Monitoring .................................................................................... 9

    5.  Other Provisions.......................................................................... 10

IV.    NOTICE HAS BEEN PROVIDED AND NO OBJECTIONS HAVE BEEN FILED .. 10

V.     ARGUMENT ................................................................................................. 11

    1.  Legal Standard for Final Approval. ............................................ 11

    2.  The Complexity, Expense, and Likely Duration of Litigation Weigh in Favor of Approving the Agreement........................................................... 12

    3.  Class Members Have Reacted Favorably to the Agreement. ........... 13

    4.  The Agreement Is the Result of Significant Investigation............... 14

    5.  There Were Risks to Establishing Liability That Are Obviated By the Settlement. ......... 15

    6.  The Risk of Establishing a Remedy Was Substantial....................... 15

    7.  The Risks of Maintaining the Class Action Through Trial Were Not Substantial But Do Not Weigh in Favor of Not Approving the Agreement. .......................................... 16

    8.  The Agreement Is Sufficient Regardless of Whether the Transit Defendants Can Withstand a Greater Judgment............................................... 17

    9.  The Settlement Is Reasonable in Light of the Best Possible Recovery. ............................ 17

    10. In Light of the Risks of Litigation, the Settlement Is Reasonable When Compared to Other Possible Recoveries. ......................................................... 17

VI.    CONCLUSION ............................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418 (S.D.N.Y. 2001) .................................. 13

*Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y. 2000) ..................... 14

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) .......................................................................... 11

*Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................ 15

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) .................................................... 11

*Ira Haupt & Co.*, 304 F. Supp. 917 (S.D.N.Y. 1969) ................................................................... 15

*Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152 (S.D.N.Y. 1999) ..................................... 11

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997) ............................................. 15

*Ross v. A.H. Robins Co., Inc.*, 700 F. Supp. 682 (S.D.N.Y. 1988) ............................................... 13

*Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146 (E.D.N.Y. 1995) ...................................... 13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .......................... 12, 13, 14

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ...................................................... 1, 3

New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4)(1)(a) ........................... 1, 3

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* .................................... 1, 3

**Rules**

Fed. R. Civ. P. 23(e)(2) ................................................................................................................ 12

I.     **INTRODUCTION**

As detailed in Plaintiffs' Unopposed Motion for Preliminary Approval and Class

Certification, ECF 157-168, the Parties have reached a historic settlement agreement (the

"Agreement" or "Settlement Agreement")[1] to make nearly the entire New York City subway

accessible for more than half a million people with disabilities who cannot use stairs. If granted

final approval, the Agreement will address the claims raised in Plaintiffs' Complaint concerning

the Transit Defendants'[2] renovation of certain New York City subway stations without installing

elevators or other stair-free routes. Plaintiffs and members of the certified Class are people

whose disabilities make their use of stairs difficult or impossible and who allege they have been

excluded from the Transit Defendants' subway system in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. § 794 *et seq.* ("Section 504"), and the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-107(4)(1)(a) ("NYCHRL").

The resulting Settlement Agreement, preliminarily approved by this Court on December

15, 2022, ECF 175, will transform the accessibility of the New York City subway system,

moving from a system where only about a quarter of subway stations are accessible, to one

where at least 95% of stations that were inaccessible at the time of the Agreement will provide

stair-free access. The Settlement Agreement represents a dramatic and unprecedented

commitment to accessibility, including a prescribed timeline, minimum funding levels, and

changes to renovation practices. Prior to the current Capital Plan, the MTA was adding stair-free

---

[1] All references to the Agreement herein refer to document attached as Exhibit 1 to the Declaration of Stuart Seaborn, ECF 159.
[2] Transit Defendants refers collectively to the Metropolitan Transportation Authority ("MTA") and New York City Transit Authority ("NYCTA") Defendants, along with their officials.

access to, on average, about four stations per year. In the current five-year Capital Plan (assuming the expected funding is obtained), the agency has committed to making approximately 66 additional stations accessible, and this Settlement Agreement contemplates continuing, and perhaps exceeding, that pace going forward until maximum accessibility has been achieved.

The Settlement Agreement between Plaintiffs and the Transit Defendants (collectively, the "Parties") [3] resolves the issues raised in Plaintiffs' Complaint. In addition to addressing the claims at issue in this litigation, the Agreement also resolves the claims in *Center for Independence of the Disabled, New York, et al. v. Metropolitan Transportation Authority, et al.* No. 153765/2017 (N.Y. Sup. Ct. N.Y. Cnty.) (hereinafter "the State Case"), a parallel state court class action with an existing certified class alleging that the systemic inaccessibility of New York City's subway system violates the NYCHRL.

As detailed below, the Parties have provided sufficient notice to the Class consistent with the Court's Joint Order Granting Preliminary Approval of Class Settlement, Certifying Settlement Class, Approving Notice, and Setting Dates for Final Approval. *See* ECF 175. To date, not a single member of the Class has filed objections or comments to the Settlement Agreement.

In light of these facts and as discussed below, the Parties respectfully request that the Court find the Settlement Agreement to be fair, adequate, and reasonable, and grant final approval of the Settlement Agreement.

---

[3] The City of New York will be discontinued with prejudice as its participation is not necessary to secure the relief required by the Settlement Agreement.

## II.     BACKGROUND OF THE CASE AND PROCEDURAL HISTORY

Plaintiffs filed this civil rights class action on May 15, 2019. ECF 1. The Complaint sought injunctive and declaratory relief against Defendants.[4] Plaintiffs alleged that Defendants were renovating New York City subway stations without installing elevators or other stair-free routes in violation of the ADA, Section 504, and the NYCHRL.

The case was vigorously litigated from the time it was filed, including two motions to dismiss by the City, a motion by Plaintiffs to strike various defenses raised by Transit Defendants, a motion for partial Judgment on the Pleadings by Transit Defendants, and contested discovery. *See* ECF 36, 47, 56-60, 62, 66-67, 75, 93, 116-22, 128-30, 135.

The Parties agreed to and executed a final Settlement Agreement on June 22, 2022. On December 15, 2022, the Court granted certification of the Class and preliminarily approved the Settlement. ECF 175. In doing so, the Court found that the Agreement "is the product of arm's length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel." *Id.* ¶ 7. The Court further noticed that the Agreement "is fair and warrants the dissemination of notice to the Class apprising them of the Settlement." *Id.* ¶ 8.

Beginning around January 5, 2023, Transit Defendants posted the long- and short-form Notices of Settlement (collectively, "the Notice") in English, Spanish, Chinese, Korean, Russian, Haitian Creole, and Bengali on a separate webpage on the MTA website, accessible via links placed on the MTA website from the "Accessibility" and "MTA projects" pages. *See* Declaration of Chloe Holzman ("Holzman Decl.") ¶¶ 8, 19.  Class Counsel made all Notice documents accessible to people with print disabilities. *Id.* ¶ 8. Class Counsel posted the Notice on DRA's website, including on the homepage and a dedicated DRA webpage for the settlement with

---

[4] The Complaint was amended in August 2019, February 2020, and October 2020. ECF 46, 90, 115.

updated information on the Fairness Hearing. *Id.* ¶ 9. Plaintiffs Center for Independence of the Disabled, New York, Brooklyn Center for Independence of the Disabled, Bronx Independent Living Services, Harlem Independent Living Center, Disabled In Action of Metropolitan New York, and New York Statewide Senior Action Council all posted the Notice on their websites, and/or social media, and/or forwarded to relevant listservs, partners, and stakeholders. *Id.* ¶¶ 10-16.

Transit Defendants included a QR code and link to the Notice on digital information screens located on platforms throughout the New York City subway system. *Id.* ¶ 20. Transit Defendants have provided Notice to the Class by making announcements about the Notice at the January and February 2023 meetings of the New York City Transit Committee of the Board of the MTA. *See id.* ¶ 21. Additionally, before the end of March, Transit Defendants plan to include the Notice in the MTA Systemwide Accessibility Team's newsletter, and plan to make an announcement about the Notice at a meeting of the MTA's Advisory Committee for Transit Accessibility, another meeting of the New York City Transit Committee, and the March 29, 2023 full MTA Board meeting.[5] *See id.*  Finally, Transit Defendants served the notices required under the Class Action Fairness Act. *Id.* ¶ 22.

To date, not a single member of the Class has filed objections or comments to the Settlement Agreement. Holzman Decl. ¶ 18.

---

[5] While Transit Defendants' distribution of the Notice via the MTA's Advisory Committee for Transit Accessibility meeting, Systemwide Accessibility Team newsletter, and full MTA Board meeting falls after the March 8, 2023 deadline for Class members to postmark written objections to the Settlement Agreement, *see* ECF 175 at ¶ 18, notice to the Class has nevertheless been sufficient given the translated and screen-reader accessible information available on the Parties' websites; Plaintiffs' outreach to New York City's disability community; and Transit Defendants' posting via digital information screens across NYC subway stations and announcements at New York City Transit Committee meetings prior to the deadline for objections.

III.     SUMMARY OF THE SETTLEMENT AGREEMENT

The landmark proposed Settlement Agreement addresses each of the issues raised in Plaintiffs' Complaint by ensuring that the New York City subway system will become accessible to the more than half a million New Yorkers who cannot use stairs. The extraordinary Agreement ensures that people with disabilities will no longer be shut out of the subway system—the lifeblood of New York City—and will be able to freely travel around the five boroughs and participate in all New York City has to offer.

Under the Agreement, the Transit Defendants commit to transforming the accessibility of the subway system by making nearly all subway stations fully accessible to the Class. First, pursuant to this Agreement, the Parties' expectation is that by 2055 (subject to funding availability and contingencies) nearly all of the MTA's 364 subway stations that were inaccessible at the time of the Agreement will be accessible to people who cannot use stairs, such as people who use wheelchairs, walkers, and crutches, as well as people with limited mobility, such as many seniors. Second, the Agreement sets minimum funding levels with each MTA Capital Plan to operationalize this goal, with minimum commitments but also flexibility for unforeseen circumstances. Third, the Agreement provides for new practices with respect to station renovations to ensure the benefits of renovations also reach the Class. Fourth, these commitments are a floor, not a ceiling, and the Agreement incorporates numerous simultaneous efforts that could supplement the station project obligations under the Agreement, such as additional federal funding and stations made accessible through public-private partnerships.

Finally, the Agreement provides for twice-yearly reporting of progress, including milestone dates, from the MTA's Chief Accessibility Officer. The Agreement also provides a dispute resolution process to address issues that may arise.

1.     **Maximum Accessibility**

Never before have the Transit Defendants committed to make their subway system maximally accessible to people with mobility disabilities. Agreement ¶¶ 2, 11. To date, the MTA states that only 130 subway stations out of the system's 493 stations (including the Staten Island Railway) have been made accessible in all directions of travel, and prior to the current Capital Plan, the MTA on average made accessible only four stations a year. *See* "MTA Accessible Stations," https://new.mta.info/accessibility/stations (last visited March 13, 2023). The current Capital Plan plans to make approximately 66 stations accessible, and this Settlement Agreement contemplates continuing, and perhaps exceeding, that pace going forward until maximum accessibility has been achieved.

Under the terms of the Agreement, at least 475 of the system's 493 total stations will be made accessible. Although there is an exception for stations where accessibility improvements are deemed to be infeasible, no more than 5% (or 18) of the system's 364 inaccessible stations as of the time of the Agreement may be deemed "infeasible" and thus not made accessible to the Class. Agreement ¶ 11(d). Moreover, any stations deemed "infeasible" will be revisited over the length of the agreement to account for new technologies and innovations, meaning the overall number of accessible stations may in fact be higher. *Id.*

2.     **Funding**

To ensure these commitments come to fruition, the Agreement provides for minimum funding levels, setting out various funding conditions and contingencies. Agreement ¶¶ 9-10. For example, assuming that future Capital Plans are as large as or larger than the originally approved 2020-2024 Capital Plan (in inflation-adjusted dollars), the Transit Defendants guarantee that at least 14.69% of the total will be devoted to station accessibility projects, as long as state of good repair (SOGR) needs are not more than 75% of the Capital Plan, to ensure that critical capital

6

needs will remain funded. *Id.* ¶¶ 6(a), 9(a)(ii)-(a)(ii)(1). To the extent that SOGR needs exceed this threshold, the percentage of the overall Capital Plan devoted to station accessibility projects will be reduced proportionally by 0.59% for each percentage over 75%. *Id.* ¶ 9(a)(ii)(2). For example, if SOGR repair comprises 77% of the total Capital Plan, a minimum of 13.51% of the Capital Plan will be guaranteed for station accessibility projects. So long as the future Capital Plan is as large as or larger than the current Capital Plan, there will always be a minimum of 8% of funding for accessibility projects even if SOGR needs compromise more than 86.33% of the total Capital Plan. *Id.* ¶ 9(a)(ii)(3). This is a first for the agency, which in the past committed as little as 2% and 3% to station accessibility projects in prior Capital Plans.

The funding formula is different if future Capital Plans are smaller than the 2020-2024 Capital Plan (adjusted for inflation), indicating budgetary restrictions. *Id.* ¶ 10. If a future Capital Plan is less than the $35.389 billion of the 2020-2024 Capital Plan, a sliding percentage scale will apply. If the funding is at least $30 billion but less than $35.389 billion, the Transit Defendants commit to a minimum of 12% of that total program for accessibility. *Id.* ¶ 10(a)(ii). If the total program is at least $20 billion but less than $30 billion, 10% will be devoted to station accessibility. *Id.* ¶ 10(a)(iii). Finally, if the Capital Plan is less than $20 billion, the Parties will have good faith discussions on how many station accessibility projects can be reasonably achieved. *Id.* ¶ 10(a)(iv).

Finally, the Agreement sets these commitments as a floor of commitments, rather than a ceiling, and expressly addresses external funding mechanisms that could provide even more station accessibility projects. The Agreement makes clear that station accessibility projects made possible by additional federal funding dedicated exclusively for station accessibility, such as from the All Stations Accessible Program designed explicitly to fund legacy rapid transit systems

as they become accessible, as well as additional local or private funding, would be in addition to rather than in lieu of the commitments included herein. *Id.* ¶¶ 13-14.

In all, these terms are remarkable and unprecedented, and ensure that the ultimate outcomes of the Agreement are assured, while the path to reach those outcomes remains sufficiently flexible to account for, and overcome, future budget uncertainties or changed circumstances.

### 3.    Renovations

Specifically addressing the claims at issue in this case, the Agreement provides new policies with respect to station renovation projects that trigger a requirement to add stair-free access. *Id.* ¶ 17. Under the Agreement, any station which entails significant rehabilitation (defined as having all station "components" rated 3 or higher on a condition survey), and a cost of $50 million or more, adjusted for inflation, will be made accessible as part of the renovation project. *Id.* ¶ 17(a). Stations made accessible through this provision will count toward the Transit Defendants' milestones and progress; however, this trigger will not apply to projects under the 2015-2019 Capital Plan. *Id.* ¶ 17(b), (d). Additionally, the Transit Defendants will consult with the Plaintiffs and consider Plaintiffs' feedback as to the identity of certain stations that are being substituted for accessibility projects. *Id.* ¶ 17(d).

The renovation provisions of the Agreement allow an exception for infeasibility. *Id.* ¶ 17(c). In the context of these renovation projects, "feasibility" retains the definition found in the ADA and its implementing regulations. *Id.* ¶ 17(c)(i); *see also Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, No. 16-CV-5023 (ER), 2021 WL 1177740 (S.D.N.Y. Mar. 29, 2021). The Agreement requires the Transit Defendants to engage in a meet-and-confer process with Plaintiffs should they determine that it is not feasible to add stair-free access to a project that would otherwise trigger the renovation provisions, and Plaintiffs reserve the right to challenge

such a determination. Agreement ¶ 17(c)(ii). The infeasibility exception for the renovation
provisions of the Agreement does not limit the Agreement's overall commitment to achieving
accessibility of at least 95% of the 364 New York City subway stations that were inaccessible at
the time of the Agreement. *Id.* ¶ 17(c)(iii).

### 4.      Monitoring

The Agreement provides multiple avenues to monitor progress, including specific
milestone goals, an expected sunset date, and regular reporting to Class Counsel. The Agreement
anticipates completion of these projects by 2055, with the caveat that certain conditions
including funding availability, as provided in the Agreement, may delay—but not eliminate—
commitments in the Agreement. *Id.* ¶ 16. Barring such conditions, the following milestones will
be observed:[6]

- 81 stations to be made accessible in the 2020-24 Capital Plan and approved prior Capital Plans;
- 85 additional stations to be accessible by 2035;
- 90 additional stations to be made accessible by 2045;
- 90 additional stations to be made accessible by 2055.

*Id.* ¶ 16(b).

Additionally, the Agreement provides for reporting every six months from the MTA's
Chief Accessibility Officer on the progress of these commitments with respect to funding,
timelines, contingency mechanisms triggered, delays, any substitutions, any additional available
funding or privately constructed accessibility upgrades, renovations, and any determinations of
infeasibility. *Id.* ¶ 24.

---

[6] The achievement of these milestones is based on when contracts to make accessibility improvements are
advertised, not when they are completed. *Id.* ¶ 16(b).

5.    **Other Provisions**

The Agreement includes the following additional provisions:

- The term of the Agreement extends until one year following substantial completion of all stations being made accessible to satisfy maximum accessibility. Agreement ¶ 16(e).

- Plaintiffs release claims related to systemic injunctive relief regarding the systemwide inaccessibility of the subway system on or before the Effective Date of the Agreement. *Id.* ¶ 20.

- There is a dispute resolution procedure if issues arise during the term of the Agreement, and the Agreement is subject to the continuing jurisdiction of the Southern District of New York. *Id.* ¶ 28.

- The Transit Defendants' obligations may be modified if certain force majeure contingencies arise, such as "the inability to obtain labor, equipment, supplies or materials," "an order or injunction from a governmental authority or a court of competent jurisdiction which prohibits or delays the performance of the work," or "actions needed to be undertaken to protect public safety, including actions taken in connection with an emergency situation or transit emergency." Should a force majeure event happen, performance may be delayed or prevented only for the affected station(s) and only for so long as a force majeure event persists. *Id.* ¶ 15.

- The Transit Defendants agree that Plaintiffs are entitled to attorneys' fees and costs as though they are prevailing parties in an amount not to exceed $4.5 million. The Transit Defendants also agree that Plaintiffs are entitled to reasonable attorneys' fees and costs for monitoring and enforcing the terms of the Agreement. *Id.* ¶ 39. Transit Defendants reserve their rights to challenge Plaintiffs' court petitions or requests for fees and costs, as provided in the Agreement. *Id.*

IV.   **NOTICE HAS BEEN PROVIDED AND NO OBJECTIONS HAVE BEEN FILED**

The Parties have disseminated the Notice through a combination of methods: posting on their websites and social media; emailing listservs serving their constituents/consumers and broader disability-focused lists; sending individual emails to stakeholders and community groups; displaying the Notice on customer information screens across NYC subway stations; and

through announcements at meetings of the New York City Transit Committee of the Board of the MTA. *See* Holzman Decl. ¶¶ 7-21.

To date, Class Counsel has received no written objections to the Settlement. *Id.* ¶ 18.

## V.   ARGUMENT

### 1.  Legal Standard for Final Approval.

In granting final approval of class action settlements, the Second Circuit has developed a non-exhaustive list of factors for the Court to consider in determining whether a proposed class action settlement is substantively fair, reasonable, and adequate so as to warrant approval. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49-50 (2d. Cir. 2000). The factors the Court must consider are: 1) the complexity, expense, and likely duration of the litigation; 2) the reaction of the class to the settlement; 3) the stage of the proceedings and the amount of discovery completed; 4) the risks of establishing liability; 5) the risks of establishing damages; 6) the risks of maintaining the class action through the trial; 7) the ability of the defendants to withstand a greater judgment; 8) the range of reasonableness of the settlement in light of the best possible recovery; and 9) the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation. *Id.* In actions for injunctive relief, courts do not grant significant weight to the last three factors, and the fifth factor is examined in light of the remedies Plaintiffs have secured rather than damages. *See Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152, 162 (S.D.N.Y. 1999), *aff'd sub nom. Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000).

The Court conducts a fairness hearing and evaluates the settlement to determine whether it is fundamentally "fair, reasonable, and adequate." *See Charron v. Wiener*, 731 F.3d 241, 247–48 (2d Cir. 2013). There is a "presumption of fairness, adequacy, and reasonableness" that "may

attach to a class settlement" such as this one that is "reached in arm's-length negotiations
between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa
U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citation and internal quotation marks omitted). In
granting final approval, the Court considers both the factors laid out in Federal Rule of Civil
Procedure 23(e)(2) and the nine *Grinnell* factors established by the Second Circuit. The Rule
23(e)(2) factors are:

> (A) the class representatives and class counsel have adequately represented the
> class;
> (B) the proposal was negotiated at arms' length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the
>> class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorneys' fees, including timing
>> of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Here, the Agreement is manifestly fair, adequate, and reasonable. It provides robust,
systemic relief that Plaintiffs sought when they filed their original Complaint over three years
ago. The Agreement will provide the Class access to a major place of public accommodation in
NYC from which they were previously excluded. The Agreement was hammered out over a
year-long period of negotiation by experienced counsel. It represents a significant and historic
civil rights victory for the Class members. It should be finally approved.

## 2. The Complexity, Expense, and Likely Duration of Litigation Weigh in Favor of Approving the Agreement.

The first *Grinnell* factor examines the complexity, expense, and likely duration of the
litigation if the case did not settle. This factor weighs in favor of granting final approval to the
Agreement. Where a settlement results in "substantial and tangible present recovery without the
attendant risk . . . . [of] further complex and protracted proceedings," the first *Grinnell* factor

weighs in favor of approval. *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001). The proceedings in this case have been heavily protracted and vigorously litigated. In this case, the Settlement affords the Class with substantial relief while avoiding further complex and costly litigation, expert discovery, and dispositive motion practice that would delay relief. Courts have generally held that when litigation has the potential "to result in great expense and to continue for a long time . . . settlement is in the best interest of the Class." *Slomovics v. All for a Dollar, Inc*., 906 F. Supp. 146, 149 (E.D.N.Y. 1995).

Continuing to litigate this matter would further delay relief for multiple years and would require both parties to expend significant resources. The Agreement, however, provides Plaintiffs with near-complete recovery for their claims and prevents the Parties and the Court from having to deal with further potentially complex, costly, and prolonged litigation. Thus, the first *Grinnell* factor weighs in favor of approval.

### 3.     Class Members Have Reacted Favorably to the Agreement.

The second *Grinnell* factor considers the reaction of the Class to the Settlement. Overwhelmingly, Class members have reacted favorably to the agreement, which will bring maximum accessibility to the entire NYC subway system at an unprecedented pace. Given that not a single Class member objected to the Agreement, this weighs heavily in favor of approval.

Courts have noted that "the absence of objectants may itself be taken as evidencing the fairness of the settlement." *Ross v. A.H. Robins Co., Inc.*, 700 F. Supp. 682, 684 (S.D.N.Y. 1988); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005) (holding that "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement"). In this case, reasonable notice of the proposed settlement, as required by Federal Rule of Civil Procedure 23(e)(1), was provided to Class members. *See* Holzman Decl. ¶¶ 7-21.  Having received notice, not a single Class member chose

13

to submit a written objection to the Agreement. *Id.* ¶ 18. Further, Class Counsel communicated with many Class members and possible Class members, and in nearly all instances, the person was reaching out to Class Counsel with questions about understanding the Notice and the action. All expressed support for improving the accessibility of the subway system, particularly with respect to the Transit Defendants' commitment to maximum accessibility in the Settlement Agreement, though some callers were disappointed the proposed timeline was not shorter. *Id.* ¶ 17. On the whole, this factor leans in favor of approval because the Agreement was overwhelmingly welcomed by the Class, who are eager to see improved stair-free accessibility in the NYC subway.

Therefore, because no Class members have objected to the Settlement Agreement, the second *Grinnell* factor weighs heavily in favor of final approval.

### 4.     The Agreement Is the Result of Significant Investigation.

The third *Grinnell* factor, which examines the stage of proceedings and the amount of discovery completed, also weighs in favor of granting final approval.

For the purposes of the third *Grinnell* factor, "it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make . . . an appraisal of the Settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (internal quotation marks omitted), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). As detailed above, this case was contested for more than three years, at every stage of the litigation. There is no question that the Settlement reflects significant investigation and research.

Consequently, "plaintiffs entered into settlement only after a thorough understanding of their case." *Wal-Mart Stores, Inc.*, 396 F.3d at 118. Because the Class "had more than enough information to make an informed and intelligent decision" regarding settlement, the third

14

*Grinnell* factor weighs in favor of granting final approval. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013).

### 5. There Were Risks to Establishing Liability That Are Obviated By the Settlement.

The fourth *Grinnell* factor examines the risks for Plaintiffs in establishing liability. Although Class Counsel believes it would have eventually prevailed, there is no denying that "[l]itigation inherently involves risks" and that there were risks to establishing liability here. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) *aff'd*., 117 F.3d 721 (2d Cir. 1997). These risks of establishing liability in this case have been eliminated by the Agreement. Therefore, the fourth *Grinnell* factor weighs in favor of final approval. *In re Ira Haupt & Co*., 304 F. Supp. 917, 934 (S.D.N.Y. 1969) ("If settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome.").

### 6. The Risk of Establishing a Remedy Was Substantial.

The fifth *Grinnell* factor examines the risks for plaintiffs in establishing a remedy. When an action seeks only injunctive relief, the Court examines the risks faced in litigation in establishing remedies rather than damages. *Marisol A*., 185 F.R.D. at 164. This factor also weighs in favor of final approval.

Although Plaintiffs believe they eventually would have prevailed on liability, the challenge to develop a remedy that would operationalize new practices and policies and remediation of multiple subway stations would have required significant time and effort. As this Court knows from *Bronx Independent Living Services v. Metropolitan Transportation Authority*, No. 16-CV-5023 (S.D.N.Y.), the factual and expert discovery needed to determine feasibility for just one station is significant. Had the Parties litigated to remedy on each of those stations, the risks for each one could have been substantial.

Unlike the risks and costs inherent in such protracted litigation, the Agreement will confer significant, timely benefits to the Class. The Agreement also contains robust reporting and enforcement provisions. Should Class Counsel identify issues with the Defendants' compliance with the Agreement, the Parties will first attempt to resolve those issues before seeking any assistance from the Court.

Furthermore, no better outcome could reasonably have been hoped for, even if Plaintiffs had taken this case successfully through trial. Assuming the Class would have succeeded in establishing liability, the Court may have ordered a different or less significant remedy. Indeed, considering Plaintiffs' current estimate that about 110 stations are potentially at issue in this case based on renovations performed during the limitations period, ECF 119, the Agreement's scope of all 364 stations that were inaccessible as of the time of the Agreement is the best possible outcome Plaintiffs could have achieved through any means.

The Agreement eliminates the risks of establishing a remedy while providing the Class with the relief sought at the start of these proceedings. Therefore, the fifth *Grinnell* factor also favors approval.

7. **The Risks of Maintaining the Class Action Through Trial Were Not Substantial But Do Not Weigh in Favor of Not Approving the Agreement.**

The sixth *Grinnell* factor examines Plaintiffs' risks of maintaining the class action through trial. Given the common issues in this case and the more than half a million Class members impacted, Plaintiffs believe they would have been able to maintain a class action through trial. Consequently, the sixth *Grinnell* factor has little bearing on whether the Agreement should be approved.

**8.  The Agreement Is Sufficient Regardless of Whether the Transit Defendants Can Withstand a Greater Judgment.**

The *Grinnell* factor examining whether Defendants may withstand a greater judgment than the agreed-upon relief weighs in favor of final approval of the Agreement. This is not a damages class action, but even if Transit Defendants could withstand a judgment requiring a more accelerated timeline or different provisions for accessibility, such requirements may not be feasible to implement. By contrast, the Agreement provides a robust set of funding and other obligations, along with concomitant contingencies, and terms for monitoring of compliance that are well-designed to address the Class' claims, and that Defendants believe they can successfully implement.

**9.  The Settlement Is Reasonable in Light of the Best Possible Recovery.**

As discussed above, the Agreement provides complete relief to the Class by setting forth a variety of policies and practices to address the issues raised in Plaintiffs' Complaint, and covering all 364 stations that were inaccessible as of the time of the Agreement. Even if Plaintiffs were to litigate this action through trial, a better outcome would be unlikely. Moreover, even in cases where Plaintiffs have not obtained complete relief but have still received a substantial benefit, courts have held that "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455.

**10.  In Light of the Risks of Litigation, the Settlement Is Reasonable When Compared to Other Possible Recoveries.**

Under the Agreement, the Class will begin to receive relief right away, without facing the risks and costs of litigation. Additional litigation would result in substantial uncertainty and delay, as well as inefficient use of the Parties' resources.  By contrast, the Agreement will provide certainty to address the issues raised in Plaintiffs' Complaint.

## VI.    CONCLUSION

Plaintiffs respectfully request that the Court order final approval of the Agreement and sign the proposed order dismissing the case but retaining jurisdiction for enforcement of the Agreement.

Dated:  March 17, 2023
      New York, New York

DISABILITY RIGHTS ADVOCATES

   *s/ Chloe Holzman*   
Chloe Holzman
Rebecca Rodgers
Torie Atkinson
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
cholzman@dralegal.org
rrodgers@dralegal.org
tatkinson@dralegal.org

Jelena Kolic
300 South Wacker Drive, Floor 32
Chicago, IL 60603
Tel: (312) 559-4660
jkolic@dralegal.org

Stuart Seaborn
2001 Center Street, 3rd Floor
Berkeley, CA 94704
Tel: (510) 665-8644
sseaborn@dralegal.org

*Attorneys for Plaintiffs*

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

  *s/ Daniel L. Brown*  
Daniel L. Brown
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Tel: (212) 634-3095
dlbrown@sheppardmullin.com

*Attorneys for Plaintiffs*